No. 26-40237

# In the United States Court of Appeals for the Fifth Circuit

NATIONAL RELIGIOUS BROADCASTERS; SAND SPRINGS CHURCH; FIRST BAPTIST CHURCH WASKOM; INTERCESSORS FOR AMERICA,

*Plaintiffs-Appellants,*

v.

SCOTT BESSENT, ACTING COMMISSIONER OF THE INTERNAL REVENUE SERVICE; INTERNAL REVENUE SERVICE,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Texas
Case No. 6:24-CV-311

## BRIEF OF AMICI AMERICAN CENTER FOR LAW & JUSTICE, CONGRESSMAN JEFF CRANK, AND CONGRESSMAN MARK HARRIS IN SUPPORT OF APPELLANTS AND REVERSAL

JORDAN A. SEKULOW
STUART J. ROTH
ANDREW J. EKONOMOU
BENJAMIN SISNEY
GEOFFREY R. SURTEES
NATHAN J. MOELKER
AMERICAN CENTER
  FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
(202) 546-8890
nmoelker@aclj.org

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case, along with the persons and entities listed by the parties. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Amici Curiae: | Counsel for Amici Curiae: |
|---|---|
| American Center for Law and Justice, Congressman Jeff Crank, and Congressman Mark Harris | Andrew J. Ekonomou of American Center for Law & Justice Washington, DC |
| American Center for Law and Justice, Congressman Jeff Crank, and Congressman Mark Harris | Jordan A. Sekulow of American Center for Law & Justice Washington, DC |
| American Center for Law and Justice, Congressman Jeff Crank, and Congressman Mark Harris | Stuart J. Roth of American Center for Law & Justice Washington, DC |
| American Center for Law and Justice, Congressman Jeff Crank, and Congressman Mark Harris | Benjamin Sisney of American Center for Law & Justice Washington, DC |
| American Center for Law and Justice, Congressman Jeff Crank, and Congressman Mark Harris | Geoffrey R. Surtees of American Center for Law & Justice New Hope, KY |
| American Center for Law and Justice, Congressman Jeff Crank, and Congressman Mark Harris | Nathan J. Moelker of American Center for Law & Justice Washington, DC |

i

/s/ Nathan J. Moelker
Counsel of Record for
Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………..iv

IDENTITY OF AMICI……………………………………………...1

SUMMARY OF ARGUMENT .................................................................3

ARGUMENT ............................................................................................6

   I.   Plaintiffs' Claims Are Not Barred by the Anti-Injunction Act or Declaratory Judgment Act Because the Purpose of the Claims Does Not Threaten Tax Collection or Assessment. .........................7

   II.  Plaintiffs' Claims Are Not Barred by the Anti-Injunction Act Because Plaintiffs Pass the *Enochs* Test. ....................................12

   III. The Johnson Amendment Violates the First Amendment............18

     A.  The Johnson Amendment Violates the First Amendment's Protection of Church Autonomy......................................................19

     B.  The Johnson Amendment Imposes an Unconstitutional Condition on Religious Exercise and Religious Speech...............24

CONCLUSION .......................................................................................32

CERTIFICATE OF COMPLIANCE.......................................................33

CERTIFICATE OF SERVICE................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Alexander v. "Americans United" Inc.,*
  416 U.S. 752 (1974) ..........................................................................................11

*Barber v. Rounds,*
  169 F.4th 577 (5th Cir. 2026)..............................................................................1

*Bates v. City of Little Rock,*
  361 U.S. 516 (1960) ..........................................................................................16

*Board of Education v. Mergens,*
  496 U.S. 226 (1990) ..........................................................................................25

*Bob Jones University v. Simon,*
  416 U.S. 725 (1974) .................................................................................... 10, 11

*Bob Jones University v. United States,*
  461 U.S. 574 (1983) ..........................................................................................24

*Bowen v. Michigan Academy of Family Physicians,*
  476 U.S. 667 (1986) ..........................................................................................18

*Branch Ministries v. Rossotti,*
  211 F.3d 137 (D.C. Cir. 2000)..............................................................................1

*Carson v. Makin,*
  596 U.S. 767 (2022) .................................................................................. 1, 24, 28

*CIC Services, LLC v. IRS,*
  593 U.S. 209 (2021) ................................................................................... passim

*Citizens United v. Federal Election Commission,*
  558 U.S. 310 (2010) ..........................................................................................32

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ....................................................................1

*Elrod v. Burns,*
  427 U.S. 347 (1976) ..................................................................16

*Enochs v. Williams Packing & Navigation Co.,*
  370 U.S. 1 (1962) ..................................................................4, 12

*Espinoza v. Montana Department of Revenue,*
  591 U.S. 464 (2020) .............................................................26, 28

*Hibbs v. Winn,*
  542 U.S. 88 (2004) ....................................................................10

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
  565 U.S. 171 (2012) .........................................................19, 21, 22

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in
  North America,* 344 U.S. 94 (1952) ......................................22

*Laird v. Tatum,*
  408 U.S. 1 (1972) ......................................................................16

*Lamb's Chapel v. Center Moriches Union Free School District,*
  508 U.S. 384 (1993) ..................................................................25

*Linn v. Chivatero,*
  714 F.2d 1278 (5th Cir. 1983) ..................................................18

*Mahmoud v. Taylor,*
  606 U.S. 522 (2025) ..................................................................17

*McConnell v. FEC,*
  540 U.S. 93 (2003) ......................................................................1

*Our Lady of Guadalupe School v. Morrissey-Berru,*
  591 U.S. 732 (2020) ..................................................................19

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ...................................................................1

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ....................................................................17

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) .............................................................25, 27, 29

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ..................................................................15

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ..................................................................28

*Walz v. Tax Commission of New York*,
  397 U.S. 664 (1970) ..............................................................26, 27

*Watson v. Jones*,
  80 U.S. 679 (1872) ...................................................................22

*Webster v. Doe*,
  486 U.S. 592 (1988) ..................................................................17

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ..................................................................25

*Zobrest* v. *Catalina Foothills School Dist.*,
  509 U.S. 1 (1993) .....................................................................29

**Statutes**

26 U.S.C. § 501(c)(3) ....................................................................9

26 U.S.C. § 7421(a) ..................................................................7, 12

26 U.S.C. § 7428(a)(1) .................................................................14

28 U.S.C. § 2201(a) ................................................................................7

**Other Authorities**

C. Antieau, A. Downey & E. Roberts, Freedom From Federal
Establishment, Formation and Early History of the First
Amendment Religion Clauses (1964)..................................................29

Gerard V. Bradley, *Forum Juridicum: Church Autonomy in the
Constitutional Order: The End of Church and State?*, 49 La.
L. Rev. 1057 (1989)............................................................................22

Calvin Coolidge, *Address at the Celebration of the 150th Anniversary of
the Declaration of Independence in Philadelphia, Pennsylvania*,
AMERICAN PRESIDENCY PROJECT (July 5, 1926),
http://presidency.ucsb.edu/documents/address-the-celebration-the-
150th-anniversary-the-declaration-independence-philadelphia.........32

Richard Gardiner, *The Presbyterian Rebellion?*, J. OF THE AM.
REVOLUTION  (Sept.  5, 2013), https://allthingsliberty.com/2013/09/
presbyterian-rebellion/#_edn15 ........................................................31

Mark A. Goldfeder & Michelle K. Terry, *To Repeal or Not Repeal:
The Johnson Amendment*, 48 Mem. L. Rev. 209 (2017) ......................31

Christopher C. Lund, *In Defense of The Ministerial Exception*,
90 N.C.L. Rev. 1 (2011) ....................................................................21

Ellis Sandoz, ed., *Political Sermons of the American Founding Era:
1730–1805* (2d ed. Liberty Fund 1998) ..............................................30

## IDENTITY OF AMICI[1]

Amicus Curiae, the American Center for Law and Justice ("ACLJ"), is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have appeared often before the Supreme Court and this Court as counsel for parties, *e.g.*, *McConnell v. FEC*, 540 U.S. 93 (2003); *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Barber v. Rounds*, 169 F.4th 577 (5th Cir. 2026); as well as *amici*, *e.g.*, *Carson v. Makin*, 596 U.S. 767 (2022); *City of Boerne v. Flores*, 521 U.S. 507 (1997).

The ACLJ has a particular interest in this case. Specializing in First Amendment litigation and religious liberty advocacy, the ACLJ is proud to have represented one of the only churches to face tax-exemption revocation under the unconstitutional Johnson Amendment in *Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. Cir. 2000). That decision set a

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amici curiae state that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from amici curiae, their members, and their counsel, made any monetary contribution toward the preparation or submission of this brief. This brief is filed with the consent of all parties pursuant to Fed. R. App. P. 29(a)(2).

chilling precedent, reinforcing fears of losing tax-exempt status and silencing churches and religious organizations from speaking prophetically to moral issues during election seasons. It demonstrated how the government can weaponize tax policy to suppress religious speech and coerce churches into abandoning their prophetic calling to address the moral issues of our time. Throughout, the ACLJ has stood firm on the conviction that the First Amendment forbids the government from telling churches how to operate.

The Members of Congress joining this brief, Congressman Jeff Crank and Congressman Mark Harris, have a distinct interest in preserving the constitutional balance between Congress's taxing authority and the First Amendment freedoms of churches, religious organizations, and their members. As legislators, they have an institutional interest in ensuring that federal statutes are construed and applied consistently with the Constitution, and that jurisdictional tax-suit bars are not expanded to shield federal speech restrictions from meaningful judicial review. They also have an interest in protecting the historic role of religious speech in public life and in ensuring that religious organizations are not forced to choose between participation in

Congress's longstanding tax-exemption framework and the exercise of core religious and political speech.

## SUMMARY OF ARGUMENT

This case is not about tax collection. It is about government-imposed silence. Plaintiffs do not seek a refund, contest an assessment, alter the amount of tax owed by any taxpayer, or ask the courts to restrain the collection of any tax. They seek prospective relief from a federal speech restriction that presently chills churches and religious organizations from saying what their faith requires them to say about candidates, elections, and moral questions of public consequence.

The Anti-Injunction Act and the Declaratory Judgment Act protect the government's ability to assess and collect taxes without pre-enforcement judicial interference; they do not give the IRS license to insulate every regulatory command placed in the Internal Revenue Code from constitutional review. The district court's contrary conclusion stretches those statutes far beyond their text and purpose, converting every challenge to a regulatory condition housed in the Code into an impermissible tax suit. The Supreme Court's decision in *CIC Services, LLC v. IRS*, 593 U.S. 209 (2021), forecloses that approach. The relevant

3

inquiry is the suit's objective aim, and the objective aim here is plain: Plaintiffs challenge an upstream rule of conduct that regulates speech, not any downstream tax consequence that might follow only after investigation, discretionary enforcement, and an entirely separate administrative determination.

Even if the tax-suit bars were implicated, Plaintiffs satisfy the equitable exception recognized in *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1 (1962). The government cannot ultimately prevail in enforcing a restriction that conditions continued tax-exempt status on the surrender of core First Amendment freedoms. And equity jurisdiction plainly exists because Plaintiffs are suffering a present, irreparable injury for which no adequate legal remedy is available. Section 7428 offers, at most, review after the IRS makes a determination regarding tax-exempt status. But Plaintiffs' injury is not merely the risk of an erroneous future determination; it is the present chilling of constitutionally protected religious and political speech. A remedy that becomes available only after Plaintiffs provoke the very enforcement they seek to avoid is no remedy for a live First Amendment injury.

On the merits, the Johnson Amendment violates the First Amendment at least twice over. First, it intrudes upon church autonomy by pressuring religious bodies to alter the content of their teaching and ministry when that teaching intersects with elections. The First Amendment protects a church's authority to define its faith, carry out its mission, and instruct its members free from civil supervision. That protection cannot be confined to hiring decisions. If the government may not decide who speaks for the church, it may not leverage the tax code to dictate what the church may say in carrying out its religious mission.

Second, the Johnson Amendment imposes an unconstitutional condition on religious exercise and religious speech. Churches do not seek a special subsidy or preferential treatment. They seek to participate in the longstanding framework of tax exemption without forfeiting their right to speak on matters at the heart of religious conviction and civic life. The government may not condition a generally available benefit on religious organizations' agreement to abstain from core political expression, especially where the condition burdens religious teaching itself. The judgment below should therefore be reversed.

5

**ARGUMENT**

Churches do not surrender their First Amendment right to speak on public issues merely because they receive tax-exempt status. The Johnson Amendment turns that principle on its head by conditioning 501(c)(3) status on silence about political candidates, even when that silence prevents churches and religious organizations from applying their faith to the moral and public issues before their congregations. That coercive pressure also strikes at the heart of the church autonomy doctrine, which forbids civil authorities from dictating how religious bodies define, teach, and carry out their faith and mission.

The district court's threshold jurisdictional decision compounds that constitutional injury by recasting Plaintiffs' challenge to this speech restriction as a challenge to taxation. But Plaintiffs seek neither to avoid a tax nor to alter any tax liability. They seek prospective relief from a statutory prohibition that presently chills protected speech and religious exercise. Because the object of this suit is a speech restriction, not the assessment or collection of taxes, the Anti-Injunction Act and Declaratory Judgment Act do not foreclose jurisdiction.

6

I. **Plaintiffs' Claims Are Not Barred by the Anti-Injunction Act or Declaratory Judgment Act Because the Purpose of the Claims Does Not Threaten Tax Collection or Assessment.**

The Anti-Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person[.]" 26 U.S.C. § 7421(a). The Declaratory Judgment Act's parallel tax-suit bar withholds jurisdiction to declare the rights of parties "with respect to Federal taxes[.]" 28 U.S.C. § 2201(a). The relevant inquiry, however, is not whether a challenged statute appears in the Internal Revenue Code or may eventually produce tax consequences. Rather, the Supreme Court has instructed that courts must examine the suit's "objective aim—essentially, the relief the suit requests." *CIC Services, LLC v. IRS*, 593 U.S. 209, 217 (2021). Here, the objective aim is to stop enforcement of a rule that presently chills religious and political speech.

Plaintiffs do not seek a refund. They do not challenge a deficiency assessment. They do not seek to avoid any existing tax liability. Nor do they ask this Court to alter the amount of tax owed by any taxpayer. Instead, Plaintiffs seek a declaration that the Johnson Amendment's prohibition on political-campaign intervention is unconstitutional and an

7

injunction against its enforcement. Their asserted injury is not taxation. Their asserted injury is present self-censorship and the chilling of constitutionally protected speech and religious exercise.

The district court viewed this as a "false dichotomy," reasoning that "both" speech and taxation are implicated because the Johnson Amendment operates as a condition on tax-exempt status. ROA.1137. That is precisely the argument the IRS made—and the Supreme Court rejected—in *CIC Services*. There, the IRS argued that a challenge to a reporting requirement was functionally a challenge to the tax penalty for violating that requirement because the two were merely "two sides of the same coin." *Id.* at 219. The Supreme Court rejected that framing. The relevant inquiry is not whether tax consequences appear somewhere in the background, but whether the suit's "objective aim—essentially, the relief the suit requests[]"—is to restrain assessment or collection. *Id.* at 217.

*CIC Services* drew the controlling distinction between an "upstream reporting mandate" and the "downstream tax" that might later be imposed for noncompliance. *Id.* at 223. The reporting mandate imposed affirmative obligations and costs "separate and apart from the statutory

8

tax penalty[,]" and the plaintiff sought "to get out from under the (non-tax) burdens of a (non-tax) reporting obligation[,]" not to restrain the assessment or collection of taxes. *Id.* at 220, 223. The Court emphasized that any tax consequence was several steps removed: the plaintiff would first have to violate the reporting rule, the IRS would then have to identify the violation, and only through a separate enforcement process would a penalty be assessed. *Id.* at 220–22. Because the suit targeted the underlying regulatory obligation—not the downstream tax consequence—the Anti-Injunction Act did not apply. The key test is this: "In considering a 'suit['s] purpose,' we inquire not into a taxpayer's subjective motive, but into the action's objective aim—essentially, the relief the suit requests." *Id.* at 217.

The same logic governs here. The Johnson Amendment is first and foremost a rule of conduct. It commands that covered organizations "not participate in, or intervene in" political campaigns. 26 U.S.C. § 501(c)(3) (LexisNexis). That command regulates speech. Revocation of exempt status and other tax consequences are merely the means by which the government enforces the underlying restriction. Plaintiffs challenge the restriction *itself*. As in *CIC Services*, the challenged legal obligation is

9

distinct from any eventual tax consequence imposed for violating it. *See CIC Services*, 593 U.S. at 225 ("[T]he suit targets not a regulatory tax, but instead a regulation that is not a tax. Here, the tax functions, alongside criminal penalties, only as a sanction for noncompliance with the reporting obligation[]"); *see also Hibbs v. Winn*, 542 U.S. 88, 104 (2004) (noting "the [Anti-Injunction Act] shields federal tax *collections* from federal-court injunctions" (emphasis added)). The relief Plaintiffs seek targets the speech restriction itself, not a tax that has been or is about to be assessed.

The district court relied principally on *Bob Jones University v. Simon*, 416 U.S. 725 (1974). That reliance does not withstand scrutiny. In *Bob Jones*, the IRS had already determined that the university's tax-exempt status would be revoked, and the university sued to prevent the consequences of that specific agency determination. *Id.* at 735–36. This case is different. No IRS determination has been made against Plaintiffs. Plaintiffs allege a present chilling injury caused by the statute itself and seek pre-enforcement relief from a speech restriction before any agency action occurs. A suit to forestall the tax consequences of an agency

10

determination already made is categorically different from a suit challenging the constitutionality of a statute that presently chills speech.

Second, *Bob Jones* predates by nearly five decades the Supreme Court's more refined approach to the tax-suit bars reflected in *CIC Services*. To be sure, *Bob Jones* and *Alexander* used broad language in describing the Anti-Injunction Act's reach. *Bob Jones,* 416 U.S. at 731–32 ("Because an injunction preventing the Service from withdrawing a § 501 (c)(3) ruling letter would necessarily preclude the collection of FICA, FUTA, and possibly income taxes from the affected organization . . . a suit seeking such relief falls squarely within the literal scope of the [Anti-Injunction Act]."); *Alexander v. "Americans United" Inc.*, 416 U.S. 752, 760 (1974) ("Section 7421 (a) does not bar merely a taxpayer's attempt to enjoin the collection of his own taxes. Rather, it declares in sweeping terms that 'no suit for the purpose of restraining the assessment or collection of any tax shall be maintained[.]'"). But as discussed above, *CIC Services* later clarified that the Anti-Injunction Act does not bar every suit that may have downstream tax consequences.

Reading *Bob Jones* as broadly as the district court did would transform every constitutional challenge to a regulatory condition

11

attached to tax status into a barred tax suit. *CIC Services* forecloses that result. Because Plaintiffs challenge the Johnson Amendment as a speech restriction, and because any tax consequence would arise only downstream through separate IRS enforcement, this suit is not "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a).

## II.    Plaintiffs' Claims Are Not Barred by the Anti-Injunction Act Because Plaintiffs Pass the *Enochs* Test.

Even if the Court concludes that the Anti-Injunction Act applies, Plaintiffs satisfy the narrow equitable exception recognized in *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1 (1962). In *Enochs*, the Supreme Court recognized a narrow exception to the Anti-Injunction Act where: (1) "it is clear that under no circumstances could the government ultimately prevail[]"; and (2) "equity jurisdiction otherwise exists[]" because the plaintiff lacks an adequate remedy at law and would suffer irreparable harm absent an injunction. *Id*. at 6–7. Both requirements are met here. The first is satisfied because Plaintiffs' claims challenge an unconstitutional speech restriction. The second is satisfied because § 7428 does not remedy Plaintiffs' present injury: ongoing self-censorship caused by a credible threat of Johnson Amendment enforcement.

12

Turning to the first prong, Plaintiffs' constitutional claims leave the government unable ultimately to prevail in enforcing the Johnson Amendment against the speech alleged here. Plaintiffs allege that churches and religious organizations wish to carry out their religious mission by teaching biblical and moral principles, explaining how those principles bear on contemporary public issues, comparing candidates' positions with those teachings, and encouraging congregants to act consistently with religious conviction. The Johnson Amendment burdens that speech by conditioning continued 501(c)(3) status on silence about candidates and elections precisely when such speech forms part of religious teaching, pastoral instruction, voter education, or public witness.

That burden intrudes upon church autonomy by pressuring religious bodies to alter the content of their ministry, and it imposes an unconstitutional condition by requiring churches to surrender core religious and political speech as the price of remaining within the Nation's longstanding tax-exemption framework. Because the injunction Plaintiffs seek would prevent enforcement of an unconstitutional

13

restriction on religious exercise and religious speech, the government cannot ultimately prevail for purposes of *Enochs*.

The second prong is independently satisfied because Plaintiffs have no adequate legal remedy for their present First Amendment injury. Plaintiffs do not allege a future, contingent risk of an erroneous tax assessment correctable by a later refund suit or declaratory judgment. They allege that the Johnson Amendment is, *right now*, causing them to refrain from political speech and association they would otherwise undertake. That is a present, ongoing injury—not a future contingent one. A remedy that becomes available only after the IRS makes a "determination," i.e., only after the very enforcement action plaintiffs structure their conduct to avoid, does nothing to redress the injury Plaintiffs allege they are suffering today. It is a remedy for a different harm (an erroneous administrative determination), not the harm actually pleaded (the present chilling of protected expression).

Section 7428 authorizes a declaratory judgment action only where an "actual controversy" involves "a determination by the Secretary" regarding an organization's qualification under § 501(c)(3). 26 U.S.C. § 7428(a)(1). By its terms, the remedy is unavailable until the IRS acts.

14

That feature creates the precise dilemma that pre-enforcement First Amendment doctrine exists to prevent: the only way for Plaintiffs to obtain the remedy the district court identified as adequate is for the IRS to take the very enforcement action—a determination regarding Plaintiffs' political-campaign-related speech—that Plaintiffs allege they presently censor themselves to avoid triggering. A plaintiff should not be required to manufacture the injury that would unlock review of the constitutional violation it is trying to prevent. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–60 (2014).

The remedy is also constrained in ways that compound its inadequacy. A § 7428 action may be brought only in the United States Tax Court, the United States Court of Federal Claims, or the United States District Court for the District of Columbia—venues with no necessary connection to where Plaintiffs are located or where their speech and associational activity occur. And the remedy, even when available, provides no interim relief; an organization remains exposed to the Johnson Amendment's effect for as long as it takes the IRS to act and the ensuing litigation to run its course. A remedy this contingent, this

15

geographically remote, and this slow is not the "adequate remedy at law" that forecloses equitable relief from an ongoing constitutional injury.

The chilling effect of a speech restriction is itself a cognizable, irreparable injury independent of whatever remedy might eventually become available if and when the government chooses to act. The Supreme Court has emphasized that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). First Amendment rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

And under *Susan B. Anthony List*, a credible threat of enforcement coupled with a plaintiff's decision to self-censor is itself sufficient to establish an Article III injury—precisely the injury Plaintiffs allege. The district court did not dispute that Plaintiffs have alleged ongoing self-censorship; it concluded only that the prospect of a future, contingent §

16

7428 suit makes that present injury adequately remediable. That conclusion is difficult to reconcile with the settled understanding that chilled speech, once it occurs, cannot be undone by a declaratory judgment obtained years later and only after the government has chosen to act. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (*per curiam*); *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025).

The district court's reliance on *Bob Jones* does not solve the problem because *Bob Jones* involved an already-issued IRS revocation determination and a taxpayer seeking to prevent tax consequences. Here, Plaintiffs seek review *before* any IRS determination, precisely *because* the statute chills speech *before* enforcement. A remedy that requires Plaintiffs either to remain silent indefinitely or to invite the very enforcement they seek to avoid is not adequate.

The Anti-Injunction Act should not be construed to force Plaintiffs into silence where Congress has not clearly required that result. That conclusion also accords with the Supreme Court's reluctance to construe jurisdiction-channeling provisions to foreclose meaningful review of serious constitutional claims absent a clear congressional command. *See Webster v. Doe,* 486 U.S. 592, 603 (1988); *Bowen v. Michigan Academy of*

17

*Family Physicians*, 476 U.S. 667, 681 n.12 (1986). Nothing in the Anti-Injunction Act clearly requires religious organizations to remain silent indefinitely or invite IRS enforcement before obtaining review of a live First Amendment injury. Section 7428 may provide review of a later tax-status determination; it does not provide meaningful review of the ongoing chill alleged here. *See Linn v. Chivatero*, 714 F.2d 1278, 1285 (5th Cir. 1983) (holding that "the district court ha[d] jurisdiction over Linn's constitutional claims . . . and that the Anti-Injunction Act does not bar consideration of Linn's request for the return of records allegedly retained in violation of the [F]ourth [A]mendment because that request pertains to his constitutional right[.]").

## III.  The Johnson Amendment Violates the First Amendment.

The First Amendment reflects a foundational principle: civil authorities may govern temporal affairs, but they may not direct the ministry of the church. That principle protects not only the right of religious organizations to speak, but also their right to determine how their faith informs their witness to the world. The Johnson Amendment intrudes on both freedoms. By threatening adverse tax consequences when churches apply their religious convictions to matters that bear on

electoral choices, it pressures religious leaders to separate faith from public witness and religious teaching from contemporary events. The Constitution requires no such division. Nor does it allow it. Because the Johnson Amendment burdens both religious expression and religious exercise, it cannot withstand First Amendment scrutiny.

### A. The Johnson Amendment Violates the First Amendment's Protection of Church Autonomy.

The Supreme Court has long recognized that religious institutions possess a constitutionally protected sphere of independence from governmental control. *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012). The Supreme Court held that the First Amendment bars government interference with a religious institution's selection of its ministers who teach religion. The Court explained that religious groups have a right "to shape [their] own faith[s] and mission[s] through [their] appointments[,]" and that this autonomy forbids "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so." *Id.* at 188. *Our Lady of Guadalupe Sch. v. Morrissey-Berru* reaffirmed and extended *Hosanna-Tabor*'s principle, emphasizing that what matters is not the employee's

19

title, but whether the position involves "vital religious duties." 591 U.S. 732, 756 (2020).

The rationale underlying those decisions extends beyond the hiring context. The First Amendment protects not merely who may preach, *but also what may be preached*. If the Constitution forbids the government from selecting a church's ministers because doing so interferes with the church's mission, it likewise forbids the government from using legal penalties to influence the content of religious teaching. Decisions concerning how a church applies Scripture, addresses moral questions, and instructs congregants regarding contemporary events are no less central to its religious mission than decisions concerning personnel. They are, in many respects, the mission itself. If the government may not decide who performs vital religious functions, of course it likewise may not dictate what those religious functions may include.

In *Hosanna-Tabor*, the Supreme Court observed that the Puritans came to New England to "establish their own modes of worship" without interference from "the national church," i.e., the authority of the regime. 565 U.S. at 182. That same concern is implicated here. The Johnson Amendment requires government officials to evaluate religious speech

20

by asking whether a church's teaching about moral and public issues has crossed the line into prohibited campaign intervention. That inquiry necessarily entangles civil authorities in judgments about the content, purpose, and application of religious instruction. A rule that pressures churches to remove religious conclusions from sermons or voter guides because those conclusions bear on candidates necessarily interferes with how the church carries out its faith.

The same autonomy principle applies when a church speaks through sermons, pastoral teaching, voter education, or other forms of religious instruction. Those communications are part of how a church carries out its faith and mission. Government may not use the threat of adverse tax consequences to pressure churches to omit religious conclusions simply because those conclusions bear on candidates or elections.

Religious autonomy is, at a minimum, "a principle of deference." Christopher C. Lund, *In Defense of The Ministerial Exception*, 90 N.C.L. Rev. 1, 17 (2011). Grounded as it is in the First Amendment, religious autonomy safeguards "a religious group's right to shape its own faith and mission through its appointments." *Hosanna-Tabor*, 565 U.S. at 188.

21

Religious autonomy is the "flagship" religious liberty issue and the "litmus test" of the Nation's "commitment to genuine spiritual freedom." Gerard V. Bradley, *Forum Juridicum: Church Autonomy in the Constitutional Order: The End of Church and State?*, 49 La. L. Rev. 1057, 1061 (1989).

Accordingly, the Supreme Court's religious autonomy decisions recognize "a spirit of freedom for religious organizations, an independence from secular control or manipulation--in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor*, 565 U.S. at 186 (citing *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952)); *see also Watson v. Jones*, 80 U.S. 679, 726–27 (1872) (discussing the control and judgment of religious organizations over their members).

The Johnson Amendment intrudes directly into this protected sphere. Plaintiffs do not seek to endorse candidates as ordinary political actors. They seek to teach religious principles, explain how those principles bear on contemporary public issues, compare competing viewpoints, and communicate to their congregations which positions

22

most closely align with their understanding of biblical truth. Those decisions concern the content of religious instruction and the manner in which churches fulfill their spiritual mission. They are precisely the sort of internal religious judgments that the First Amendment places beyond governmental control.

Yet the Johnson Amendment imposes pressure on churches to alter those judgments. Rather than allowing churches to determine for themselves how faith should be applied to public questions, it conditions legal benefits on churches refraining from certain forms of religious witness. The result is governmental influence over matters of doctrine, ministry, and religious communication. The First Amendment does not permit civil authorities to wield the tax code as a means of supervising the content of sermons or determining when religious teachings may be applied to contemporary political controversies. The autonomy protected by *Hosanna-Tabor* and *Our Lady of Guadalupe* forecloses the Johnson Amendment's application to core religious speech.

### B. The Johnson Amendment Imposes an Unconstitutional Condition on Religious Exercise and Religious Speech.

The government cannot achieve indirectly through the withholding of benefits what it may not command directly. Even where no person possesses an entitlement to a particular governmental benefit, the Constitution forbids the government from conditioning that benefit on the surrender of constitutional rights. The Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson v. Makin*, 596 U.S. 767, 778 (2022). The problem is not that Congress must subsidize political campaign intervention. The problem is that once Congress creates a generally available tax-exemption framework for religious and charitable organizations, it may not condition continued participation on abandoning protected religious speech.

The Supreme Court has held that tax exemption is a government "benefit." *Bob Jones University v. United States*, 461 U.S. 574, 595 (1983). Moreover, the Supreme Court has long taken for granted both that generally available benefits may reach religious entities and religious ends without any Establishment Clause violation, and that the

24

government violates the First Amendment when it excludes religious speech from a program open to comparable secular speech. *See Widmar v. Vincent*, 454 U.S. 263, 271, 276 (1981) (holding that policy excluding religious worship from university buildings violated Free Speech Clause and was not justified by Establishment Clause); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395–97 (1993) (holding that excluding a church from a generally available program for displaying educational films violated the Free Speech Clause and was not justified by the Establishment Clause); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 843–45 (1995) (holding that excluding students from a program that paid printing costs for student publications on the basis of their religious viewpoint violated the Free Speech Clause and was not justified by the Establishment Clause).

The Supreme Court has emphasized that "the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.* at 839; *see also Bd. of Educ. v. Mergens,* 496 U.S. 226, 248 (1990) ("[T]he message is one of neutrality rather than endorsement; if a

State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion."). Time and again, the Supreme Court has emphasized a basic principle: once the government makes a generally applicable program available, whether through funding or otherwise, it may not discriminate on the basis of religious identity or activities. *See Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 474 (2020) ("We have repeatedly held that the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs.").

In *Walz v. Tax Commission of New York*, 397 U.S. 664 (1970), the Supreme Court upheld tax exemptions for churches, recognizing the unbroken chain of history supporting the availability to religious entities of generally available programs. The Supreme Court emphasized that "Congress, from its earliest days, has viewed the Religion Clauses of the Constitution as authorizing statutory real estate tax exemption to religious bodies." *Id.* at 677. The Supreme Court cited at length several statutes from early Congresses that adopted such tax exemptions. *Id.* at 677–78. The historical record was irrefutable: "an unbroken practice of according the exemption to churches, openly and by affirmative state

26

action, not covertly or by state inaction, is not something to be lightly cast aside." *Id.* at 678.

In *Rosenberger*, the Supreme Court further refined these principles, holding that the First Amendment was violated when a University of Virginia funding program was denied to religious participants. Excluding religious participants from generally applicable funding is unconstitutional: "the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Rosenberger,* 515 U.S. at 828. The University of Virginia argued that banning funding of religious speech was justified by the Establishment Clause, and "the Fourth Circuit asserted that direct monetary subsidization of religious organizations and projects" is a unique Establishment Clause concern. *Id.* at 838. The Supreme Court wholeheartedly rejected this argument, emphasizing that it had repeatedly "rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design." *Id.* at 839.

27

The guarantee of neutrality is protected, not offended, when the government extends benefits to diverse viewpoints, including religious ones. That principle animates the Court's decisions in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), *Espinoza*, and *Carson*. In each case, the State made a public benefit generally available to qualifying participants but attempted to withhold that benefit from religious organizations or religious activity. Each time, the Court rejected the exclusion. Once the government makes a public benefit generally available, it may not require religious entities to abandon protected religious conduct as the price of participation.

In *Espinoza*, the Supreme Court held that a ban on aid only to "sectarian" schools violates the nondiscrimination norm articulated in *Trinity Lutheran* and "the decades of precedent on which it relied." 591 U.S. at 484. And then, in *Carson*, 596 U.S. at 789, the Supreme Court held that Maine, with a program that "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise[,]" had likewise violated the Free Exercise Clause.

The historical evidence that government programs at the Founding provided religious benefits is irrefutable. Religious entities receive

28

benefits from almost all public programs, of course, such as roads, fire departments, police services, and the like. Religious exemptions from property taxation, as discussed *supra*, seem to be as old as taxation itself. "Consistent application of the dissent's 'no-aid' principle would require that 'a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair.'" *Rosenberger*, 515 U.S. at 861 (Thomas, J., concurring) (quoting *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 8 (1993)).

The historical record is clear that "Americans from 1789 to 1825 accepted and practiced governmental aid to religion and religiously oriented educational institutions[.]" *Id.* at 863 (Thomas, J., concurring) (quoting C. Antieau, A. Downey, & E. Roberts, Freedom From Federal Establishment, Formation and Early History of the First Amendment Religion Clauses 174 (1964)). Reflecting that tradition, churches are not seeking a special privilege unavailable to others. Nor are they seeking a unique exemption from generally applicable laws. They seek only to participate in the same longstanding tax-exemption framework available to qualifying religious organizations without surrendering constitutional rights. Yet the Johnson Amendment conditions continued participation

29

in that framework on refraining from speech that lies at the intersection of religious exercise and core political expression. A church may retain its tax-exempt status only if it accepts governmental limits on how it communicates religious teachings concerning candidates and elections.

That burden is especially foreign to this Nation's history. From the colonial period through the Founding, churches and ministers routinely addressed public affairs from a religious perspective. Election sermons, fast-day sermons, thanksgiving sermons, and sermons on questions of civil authority were not marginal features of American public life; they were the central means by which religious leaders applied Scripture to questions of governance, liberty, public virtue, and civic duty. Indeed, collections of Founding-era sermons reflect an extensive tradition of clergy speaking directly to matters of government, political obligation, resistance to tyranny, constitutional order, and the moral responsibilities of citizens and rulers. *See, e.g.*, Ellis Sandoz, ed., *Political Sermons of the American Founding Era: 1730–1805* (2d ed. Liberty Fund 1998) (collecting political sermons from the Founding era, including sermons by Jonathan Mayhew, John Witherspoon, Moses Mather, Samuel Sherwood, George Duffield, Noah Webster, and others).

Religious life and sermons were so important to the American Revolution that it was referred to as the "Presbyterian Rebellion" in recognition of the significant role that religion and preaching played in the political life of the Founding. *See* Richard Gardiner, *The Presbyterian Rebellion?*, J. OF THE AM. REVOLUTION (Sept. 5, 2013), https://allthingsliberty.com/2013/09/presbyterian-rebellion/#_edn15; *see also* Mark A. Goldfeder & Michelle K. Terry, *To Repeal or Not Repeal: The Johnson Amendment*, 48 Mem. L. Rev. 209, 212–18 (2017).

That history confirms that religious teaching about public affairs— including questions that bear on elections—has long been understood as part of the church's religious witness, not as a privilege the government may condition away through the tax code. Our country just celebrated its 250th anniversary; President Coolidge remarked in his speech for the 150th anniversary that

> when we come to a contemplation of the immediate conception of the principles of human relationship which went into the Declaration of Independence we are not required to extend our search beyond our own shores. They are found in the texts, the sermons, and the writings of the early colonial clergy who were earnestly undertaking to instruct their congregations in the great mystery of how to live.

31

Calvin Coolidge, *Address at the Celebration of the 150th Anniversary of the Declaration of Independence in Philadelphia, Pennsylvania*, AMERICAN PRESIDENCY PROJECT (July 5, 1926), http://presidency.ucsb.edu/documents/address-the-celebration-the-150th-anniversary-the-declaration-independence-philadelphia.

The burden imposed by the Johnson Amendment is particularly suspect because it falls upon political speech, which occupies the highest position in the hierarchy of First Amendment values. Speech concerning candidates, elections, and public affairs is "central to the meaning and purpose of the First Amendment." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 329 (2010). When the government conditions a generally available benefit on a church's agreement to refrain from such speech, it burdens both the Free Speech Clause and the Free Exercise Clause simultaneously.

In the end, the Johnson Amendment presents religious organizations with a constitutionally impermissible choice: retain the benefits Congress has long extended to churches, or fully exercise their rights to communicate religious teaching concerning candidates and elections. The First Amendment does not allow the government to

32

leverage tax policy in that manner. Because the Johnson Amendment intrudes upon church autonomy and conditions a generally available public benefit on the surrender of constitutional freedoms, it violates both the Free Speech Clause and the Free Exercise Clause.

***

The First Amendment does not permit the government to condition a church's continued participation in the Nation's longstanding tax-exemption framework on silence about matters of faith, morality, and public consequence. Nor do the tax-suit bars require courts to ignore a present constitutional injury merely because the enforcement mechanism appears in the Internal Revenue Code.

## CONCLUSION

The Court should reverse the judgment of the district court.

Respectfully submitted,

/s/ *Nathan J. Moelker*
NATHAN J. MOELKER
JORDAN A. SEKULOW
STUART J. ROTH
ANDREW J. EKONOMOU
BENJAMIN SISNEY
GEOFFREY R. SURTEES
AMERICAN CENTER
  FOR LAW & JUSTICE

33

201 Maryland Ave., NE
Washington, DC 20002
(202) 546-8890
nmoelker@aclj.org
*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because it contains 6,089 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.

Date: July 14, 2026

*/s/ Nathan J. Moelker*
NATHAN J. MOELKER
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2026, I electronically filed a copy of the foregoing *Amici Curiae* Brief using the ECF System which will send notification of that filing to all counsel of record in this litigation.

Date: July 14, 2026

/s/ *Nathan J. Moelker*
NATHAN J. MOELKER
*Counsel for Amici Curiae*