No. 26-40237

# In the United States Court of Appeals
# for the Fifth Circuit

NATIONAL RELIGIOUS BROADCASTERS, et al.,
*Plaintiffs-Appellants,*

v.

SCOTT BESSENT et al.,
*Defendants-Appellees,*

On Appeal from the United States District Court
for the Eastern District of Texas

**BRIEF FOR AMICI CURIAE HOME SCHOOL LEGAL DEFENSE
ASSOCIATION, TRUE NORTH LEGAL, KANSAS FAMILY,
TEXAS VALUES, AND WAGNER FAITH & FREEDOM CENTER
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

ANNE MARIE MACKIN
JOHN EHRETT (admission pending)
LEX POLITICA PLLC
700 Pennsylvania Ave. SE, #440
Washington, DC 20003
Tel.: (512) 354-1783
amackin@lexpolitica.com
jehrett@lexpolitica.com

*Attorneys for Amici Curiae*

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

*National Religious Broadcasters, et al., v. Bessent et al.,*
**Case No. 26-40237**

Pursuant to Fifth Cir. Rule 29.2, undersigned counsel certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualifications or recusal.

*Amici Curiae*: Home School Legal Defense Association, True North Legal, Kansas Family, Texas Values, Wagner Faith & Freedom Center at Spring Arbor University

**Attorneys for *Amici Curiae***: John Ehrett (Lex Politica PLLC), Anne Marie Mackin (Lex Politica PLLC)

Dated: July 14, 2026          /s/ Anne Marie Mackin
ANNE MARIE MACKIN

Attorney for *Amici Curiae*

i

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation or issues stock. The Wagner Faith & Freedom Center operates under the auspices of Spring Arbor University, its parent entity. No other party to this brief has a parent corporation.

# TABLE OF CONTENTS

Supplemental Statement of Interested Persons..........................................i

Corporate Disclosure Statement................................................................ii

Table of Contents ................................................................................. iii

Table of Authorities..............................................................................iv

Interest of *Amici Curiae*...................................................................... 1

Summary of Argument.............................................................................6

Argument.................................................................................................7

   I.   Increasingly, the Supreme Court Has Narrowly Construed "Jurisdictional" Bars to Suit. ...............................................................7

     A.  "Jurisdiction" Is a Historically Ambiguous Legal Term. .............7

     B.  Today's Supreme Court Distinguishes "Jurisdictional" from "Claims-Processing" Rules. ..................................................................9

   II.  The Anti-Injunction Act, Properly Construed, Is Not Jurisdictional....................................................................................... 11

     A.  The Text of the AIA Does Not Suggest a Jurisdictional Rule....12

     B.  The Structure of the AIA Does Not Suggest a Jurisdictional Rule....................................................................................................14

     C.  The Context of the AIA Does Not Suggest a Jurisdictional Rule… ..................................................................................................15

     D.  Consistent with a Non-Jurisdictional View of the AIA, the Supreme Court Has Long Permitted Equitable Exceptions and Waiver..................................................................................................17

     E.  The AIA Is a Claims-Processing Rule........................................19

   III. The AIA, Properly Construed, Allows Plaintiffs' Suit to Proceed. 20

Conclusion ...........................................................................................22

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Acklin v. People's Sav. Ass'n,*
293 F. 392 (N.D. Ohio 1923)................................................................. 18, 21

*Arbaugh v. Y&H Corp.,*
546 U.S. 500 (2006) ................................................................................ 12

*Bailey v. George,*
259 U.S. 16 (1922) ........................................................................... 18, 20, 21

*Bob Jones Univ. v. Simon,*
416 U.S. 725 (1974) ................................................................................ 15

*Dodge v. Osborn,*
240 U.S. 118 (1916) .......................................................................... 18, 20

*Dows v. City of Chicago,*
78 U.S. 108 (1870) .................................................................................. 21

*Enochs v. Williams Packing & Nav. Co.,*
370 U.S. 1 (1962) .................................................................................... 19

*Gonzalez v. Thaler,*
565 U.S. 134 (2012) ........................................................................... 11, 17

*Helvering v. Davis,*
301 U.S. 619 (1937) ................................................................................ 15

*Henderson ex rel. Henderson v. Shinseki,*
562 U.S. 428 (2011) .................................................................................. 9

*Huston v. Iowa Soap Co.,*
85 F.2d 649 (8th Cir. 1936) .................................................................... 18

*John A. Gebelein, Inc. v. Milbourne,*
12 F.Supp. 105 (D. Md. 1935) ........................................................... 18, 20

*Kontrick v. Ryan*,
   540 U.S. 443, 455 (2004) ................................................................ 10

*Larabee Flour Mills Co. v. Nee*,
   12 F.Supp. 395 (W.D. Mo. 1935) ............................................. 18, 20

*Mesa v. United States*,
   67 U.S. (2 Black) 721 (1862) ............................................................ 8

*Miller v. Standard Nut Margarine Co. of Fla.*,
   284 U.S. 498 (1932) ................................................................... 17, 19

*Murdock v. Pennsylvania*,
   319 U.S. 105 (1943) ......................................................................... 5

*Mussina v. Cavazos*,
   73 U.S. (6 Wall.) 355 (1867) ............................................................ 8

*Pollock v. Farmers' Loan & Trust Co.*,
   157 U.S. 429 (1895) ........................................................................ 19

*Reed Elsevier, Inc. v. Muchnick*,
   559 U.S. 154 (2010) ........................................................... 10, 12, 14

*Santos-Zacaria v. Garland*,
   598 U.S. 411 (2023) ................................................................... 13, 17

*State R.R. Tax Cases*,
   92 U.S. 575 (1875) .......................................................................... 14

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ............................................................................ 9

*Sunshine Anthracite Coal Co. v. Adkins*,
   310 U.S. 381 (1940) ........................................................................ 19

*Walz v. Tax Comm'n of City of New York*,
   397 U.S. 664 (1970) ........................................................................ 21

*Wiscart v. D'Auchy*,
   3 U.S. (3 Dall.) 321 (1796) ............................................................... 8

*Zipes v. Trans World Airlines, Inc.*,
    455 U.S. 385 (1982) ....................................................................... 14

## Statutes

26 U.S.C. § 501(c)(3) ..................................................................... 4

26 U.S.C. § 7421(a) ................................................................ *passim*

28 U.S.C. § 1341 ............................................................... 13, 16, 17

## Rules

Fed. R. Civ. P. 12(h)(3) ................................................................ 7

## Other Authorities

ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA
    (Harvey C. Mansfield & Delba Winthrop eds. 2000) (1840)............ 1

Cong. Globe, 39th Cong., 2d Sess. 1933 (1867)...................................... 16

## INTEREST OF *AMICI CURIAE*[1]

The Home School Legal Defense Association is a nonprofit advocacy organization dedicated to protecting families' freedom to homeschool their children. Advancing that mission requires HSLDA to engage in lobbying and grassroots advocacy on issues affecting homeschooling at both the state and federal levels.

Such advocacy has long been a cornerstone of American democracy, enabling ordinary Americans to engage together in civic life and political speech. As Alexis de Tocqueville observed, "[i]f men who live in democratic countries had neither the right nor the taste to unite in political goals, their independence would run great risks." ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 490 (Harvey C. Mansfield & Delba Winthrop eds. 2000) (1840). HSLDA has a strong interest in ensuring that nonprofit advocacy organizations may obtain meaningful judicial review of constitutional questions before being forced to choose between

---

[1] Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, undersigned counsel for *amici curiae* certify that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici curiae* and its counsel have contributed money for this brief. Counsel were timely notified of this brief as required by Fed. R. App. P. 29, and all parties consented to its filing.

1

exercising protected speech and risking the loss of their tax-exempt status. A rule that conditions access to the courts on first incurring that penalty inevitably chills the robust advocacy and civic participation that the First Amendment is designed to protect.

True North Legal, Kansas Family, and Texas Values are nonprofit religious organizations engaging in public policy in their respective states, with a primary interest in protecting religious liberty. As such, these organizations regularly engage with, and some organizations represent, churches of various denominations. The common denominator among all the organizations which represent various political dynamics in each state, is the lack of clarity regarding churches' abilities to engage in dialogue about issues that are core to their missions for fear of running afoul of the Johnson Amendment. As such, churches across the country are caught in the crosshairs of self-censoring or abandoning their religious convictions and obligations to speak truthfully about biblical issues or political candidates, simply because the government has deemed that speech political.

The Wagner Faith & Freedom Center at Spring Arbor University is an academic and public policy center dedicated to advancing the study

and preservation of religious liberty, constitutional government, the rule of law, and the American constitutional tradition. Through scholarship, public education, legal research, and engagement with courts, legislators, educators, and religious leaders, the Center seeks to promote a proper understanding of the freedoms secured by the Constitution, particularly those protected by the Religion Clauses and the Free Speech Clause of the First Amendment. The Center regularly addresses questions concerning the relationship between church and state, the constitutional protection afforded religious institutions, and the proper interpretation of the Religion Clauses according to their original public meaning, historical practice, and the Supreme Court's jurisprudence. Its work includes legal scholarship, public policy analysis, educational programming, and participation as *amicus curiae* in cases presenting issues of significant constitutional importance.

Freedom of speech—and particularly the freedom of religious institutions and ministers to proclaim their religious convictions without governmental coercion or penalty—lies at the heart of the Center's mission. The Wagner Faith & Freedom Center is committed to the principle that robust protection for religious expression is indispensable

to a free society and that the First Amendment secures broad constitutional protection for religious speech, including speech addressing matters of public concern.

Under current federal law, the Johnson Amendment, codified at 26 U.S.C. § 501(c)(3), has long been understood to prohibit churches and other tax-exempt religious organizations from participating or intervening in political campaigns if they wish to retain their tax-exempt status. As commonly interpreted, the Amendment places substantial governmental pressure upon ministers, churches, and religious organizations to refrain from speech that may bear directly upon political candidates or campaigns, even where such speech arises naturally from sincerely held religious convictions and faithful exposition of Scripture.

The Wagner Faith & Freedom Center believes that ministers should remain free to proclaim the whole counsel of God—including biblical teaching that bears upon public officials, elections, and questions of public morality—without fear that faithful religious speech may subject their churches or ministries to governmental retaliation through the loss of tax-exempt status.

4

Although the Johnson Amendment does not directly prohibit religious speech, its threatened withdrawal of tax-exempt status substantially increases the financial burden associated with exercising First Amendment freedoms. As the Supreme Court has long recognized, "Those who can tax the exercise of … religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance." *Murdock v. Pennsylvania,* 319 U.S. 105, 112 (1943).

Because "[t]he power to tax the exercise of a privilege is the power to control or suppress its enjoyment," *id.,* the Wagner Faith & Freedom Center has a substantial interest in cases addressing the intersection of governmental taxing authority and constitutionally protected religious expression. That interest necessarily includes the procedural question presented here: whether the Anti-Injunction Act bars pre-enforcement constitutional challenges to a tax provision that allegedly burdens the free exercise of religion and the freedom of speech. The resolution of that question will significantly affect the ability of religious institutions to seek timely judicial protection for their constitutional rights before suffering potentially devastating governmental sanctions. Accordingly, the Wagner Faith & Freedom Center has significant interest in the

correct resolution of the present case, and respectfully submits this brief in support of Plaintiffs-Appellants.

## SUMMARY OF ARGUMENT

The Anti-Injunction Act is often misread as a jurisdictional bar to any and all pre-enforcement challenges relating to taxes, including the challenge in the instant case. But text, history, tradition, and current practice all counsel otherwise.

The Supreme Court has repeatedly chipped away at so-called drive-by jurisdictional rulings. Because the term "jurisdictional" was once bandied about with imprecision, that Court has emphasized that the mere fact that a prior court referred to a provision as jurisdictional does not necessarily deprive a court today of the power to hear a particular case or claim. Indeed, under current law, Congress must speak clearly if it wishes a precondition to suit to divest the federal courts of adjudicatory authority.

The Supreme Court reinforces this principle by distinguishing between jurisdictional rules and claims-processing rules. The AIA, rightly understood, is a claims-processing rule. Its text, structure, and context make clear that the statute was never intended to foreclose any

6

and all actions to enjoin a tax prior to enforcement. Rather, the AIA's intended operation is straightforward: *in general*, tax-related claims can only be heard by a court after the tax has been paid. But where extraordinary circumstances are present—as here—a court, by exercising inherent equitable powers, can nonetheless entertain a claim.

At bottom, the AIA does *not* strip courts of jurisdiction to entertain pre-enforcement tax challenges in the first instance. And it certainly does not preclude a court from hearing appellants' challenge in this case.

## ARGUMENT

### I. Increasingly, the Supreme Court Has Narrowly Construed "Jurisdictional" Bars to Suit.

#### A. "Jurisdiction" Is a Historically Ambiguous Legal Term.

Today, the legal term "jurisdiction" is mainly used to mean one thing, and one thing only: the power of a court to hear a particular case or claim. At current law, jurisdictional prerequisites are foundational, must be independently ascertained by a court, and—in the case of subject-matter jurisdiction—cannot be waived. Fed. R. Civ. P. 12(h)(3). The rule seems simple enough: no jurisdiction, no lawsuit.

History, though, proves more complicated. The simplicity of the modern rule risks reinforcing an assumption that the term "jurisdiction" has *only ever* meant one thing: a carefully delineated boundary beyond which no court may step, at pains of acting ultra vires. But that assumption is false. Since the Marshall Court, the term "jurisdiction" was routinely used to describe a wide range of legal conditions ranging from filing deadlines to the elements of a particular cause of action—many having nothing whatsoever to do with any questions of Congress's specification of a court's adjudicatory authority. *See, e.g.*, *Wiscart v. D'Auchy*, 3 U.S. (3 Dall.) 321, 327 (1796) (treating presence or absence of statement of facts in chancery cases as jurisdictional); *Mesa v. United States*, 67 U.S. (2 Black) 721, 721 (1862) (treating five-year appellate deadline as jurisdictional); *Mussina v. Cavazos*, 73 U.S. (6 Wall.) 355, 358 (1867) (treating certiorari prerequisites as jurisdictional).

The historical murkiness surrounding the term jurisdiction has crucial implications for statutory interpretation. To read a modern (restrictive) concept of jurisdiction backwards into centuries-old legal texts is both anachronistic and contrary to basic statutory interpretation. It is analogous to seeing no meaningful distinction between the

geocentric cosmology of the medieval period and modern quantum mechanics, simply because both disciplines, at one time, used the word "science" to describe themselves. A court does not, and cannot, effectuate the original meaning of statutory text by ignoring the meaning of a term at the time the text was written.

### B. Today's Supreme Court Distinguishes "Jurisdictional" from "Claims-Processing" Rules.

In recent years, the Supreme Court has grown increasingly aware of this longstanding ambiguity around the term "jurisdiction." As Justice Scalia wrote in 2000: "'Jurisdiction,' it has been observed, 'is a word of many, too many, meanings.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (citations omitted).

The Court's ongoing efforts to untangle this doctrinal snarl produced the current distinction between genuinely jurisdictional rules— which implicate the judiciary's powers to hear a case, as determined by Congress—and claims-processing rules, which simply "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). Under the Court's modern jurisprudence, rules such as filing deadlines are not properly

9

"jurisdictional." As claims-processing rules, they simply have to do with the effective administration of a lawsuit. Going forward, the Court has explained, "[c]larity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004).

But the Court's consolidation of the jurisdictional/claim-processing distinction left open an important question: what, exactly, to do with prior precedents, many of which incorrectly used the language of "jurisdiction" to refer to preconditions to suit more accurately described as claims-processing rules? In subsequent cases, the Court made clear that mere historical practice—or the use of the word "jurisdictional"— does not magically convert a rule that is *logically* a claims-processing rule into a jurisdictional rule. The term "jurisdictional" is not talismanic. Rather, "the relevant question here is not . . . whether [a statute] has long been labeled jurisdictional, but whether *the type of limitation that [it] imposes is properly ranked as jurisdictional* absent an express designation." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 168 (2010)

10

(emphasis added). The *logical* question of whether a limitation is jurisdictional or a claim-processing rule must be asked and answered in the context of each specific statute.

As a result of these changes, statutory precedents prior to the Court's clarification of the jurisdictional/claim-processing distinction must be reconsidered. The present case is no exception.

## II.    The Anti-Injunction Act, Properly Construed, Is Not Jurisdictional.

Congress passed the Anti-Injunction Act (AIA) in 1867, to facilitate the enforcement of tax laws and—in most cases—restrict judicial interference with that process. The Act states that, with certain designated exceptions, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).

This language is sweeping. But *sweeping* is not the same thing as *jurisdictional.* Indeed, the Supreme Court has long "rejected the notion that all mandatory prescriptions, however emphatic, are . . . *jurisdictional.*" *Gonzalez v. Thaler*, 565 U.S. 134, 146 (2012) (internal quotation omitted; emphasis added). The Federal Rules of Civil

Procedure, for example, are both mandatory and sweeping, but noncompliance does not typically rob a court of *jurisdiction* to hear the non-complying suit. For the AIA to be *jurisdictional* in the proper sense— that is, for the statute to remove pre-enforcement tax challenges altogether from the ambit of judicial authority—text, structure, and context must demonstrate that fact. *Reed Elsevier*, 559 U.S. at 166. But none does.

## A.    The Text of the AIA Does Not Suggest a Jurisdictional Rule.

Under current Supreme Court jurisprudence, a legislator must "clearly state[] that a threshold limitation on a statute's scope shall count as jurisdictional" if the statute is to constitute a jurisdictional bar. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006).

The text of the AIA contains no such clear statement. Quite the contrary: the statute clearly specifies that the AIA binds a *taxpayer litigant*, not the *courts*. *See* 26 U.S.C. § 7421(a) (restricting pre-enforcement tax suits "*by any person*"). Had Congress intended to categorically divest courts of jurisdiction to hear such claims, it could readily have done so—specifying that *no court* shall entertain such a suit. It has often done so for other statutes, establishing that Congress knows

how to speak in jurisdictional terms when it so chooses. 28 U.S.C. § 1341 (stating "[t]*he district courts* shall not enjoin, suspend, or restrain" the assessment of state or local taxes). And yet, the text of the AIA specifies that the actor subject to the rule is the *litigant*—a prototypical claims-processing focus.

Further, the AIA imposes an exhaustion requirement—"a quintessential claim-processing rule." *Santos-Zacaria v. Garland*, 598 U.S. 411, 417 (2023). And exhaustion requirements are not typically jurisdictional because such "treatment could disserve the very interest in efficiency that exhaustion ordinarily advances." *Id.* at 418. As the Supreme Court recently explained, "it would therefore be aberrant for [an] exhaustion requirement … to be characterized as jurisdictional." "Of course, Congress is free to attach jurisdictional consequences to a requirement that usually exists as a claim-processing rule, [b]ut to be confident Congress took that unexpected tack, we would need unmistakable evidence, on par with express language addressing the court's jurisdiction." *Santos-Zacaria*, 598 U.S. at 418. Nothing close appears here. The AIA's text fails to support an explicitly jurisdictional reading.

13

**B.    The Structure of the AIA Does Not Suggest a Jurisdictional Rule.**

The AIA's placement in the statutory scheme likewise undermines a jurisdictional interpretation. The AIA is not found in a jurisdiction-granting provision, but in a section of the tax code otherwise governing procedure and administration. This fact—that the AIA "is located in a provision 'separate' from those granting federal courts subject-matter jurisdiction over [the] respective claims"—supports construing the AIA as nonjurisdictional. *Reed Elsevier*, 559 U.S. at 164.

So too, the fact that the AIA contains numerous exceptions supports a nonjurisdictional reading: it would make little sense for Congress to take the radical step of stripping jurisdiction from courts to hear certain categories of claims, while simultaneously introducing *fourteen* statutory exceptions to that bar. *See id.* at 165; *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393–94, 397 (1982).

Over and beyond these elements, the broad structural purpose of the AIA—to prevent interference with "the process of collecting the taxes on which the government depends for its continued existence," *State R.R. Tax Cases*, 92 U.S. 575, 613 (1875)—further reinforces a nonjurisdictional reading. The AIA was not enacted to limit the powers

of the judiciary. It was enacted to facilitate the government's broad policy of tax collection. That's why *the government itself* has argued that the AIA does not preclude a court from entertaining a pre-enforcement challenge to a tax in certain circumstances. Where "the litigation of an injunction suit [was] more important for the protection of the revenues than insistence upon adherence to the ordinary procedure of payment followed by a suit for refund," Br. for Pet'rs at 22–23, *Helvering v. Davis*, No. 36-910, 301 U.S. 619 (1937), the government argued that the suit should move forward. That rationale—and the interpretation of the AIA that lies behind it—is irreconcilable with an AIA that strips the federal courts of jurisdiction.

## C. The Context of the AIA Does Not Suggest a Jurisdictional Rule.

Even beyond the text and structure of the AIA, context clues indicate that the AIA was never envisioned as a jurisdictional statute. No legislative history suggests as much: indeed, as the Supreme Court has recognized, the AIA "apparently has no recorded legislative history." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974). The most that can be said from the legislative record is that those who offered the AIA did not view it as a radical change: moments before the AIA was introduced, the bill's

15

proponent declared his hopes that the Senate would "not interfere with a [revenue] system so well established" as it had been.  Cong. Globe, 39th Cong., 2d Sess. 1933 (1867). That is to say: the AIA was *not* meant to effect a broad change in the courts' preexisting ability to adjudicate—or not adjudicate—tax-related claims, as would be the case if a *new* jurisdictional bar had been created.

Indeed, such a bar would have been nonsensical, since at the time of the AIA's enactment, general federal question jurisdiction did not yet exist. When viewed in historical context, a jurisdictional interpretation of the AIA construes the statute as a solution in search of a virtually nonexistent problem: a mechanism for precluding federal courts from hearing pre-enforcement tax challenges that those courts *already* could not hear. That logic is, to say the least, unusual.

In contrast, when Congress enacted the Tax Injunction Act some 70 years later it was plainly speaking to the adjudicatory authority of the federal courts. Codified at 28 U.S.C. § 1341, that statute prevents federal district courts from interfering with the assessment of any *state* or *local* tax. It is clearly jurisdictional in a way the AIA is not, stating that "*the district courts* shall not enjoin, suspend, or restrain" the assessment of

16

state or local taxes, where an adequate remedy is available at state or local law. 28 U.S.C. § 1341. (emphasis added). Conversely, the AIA, as previously noted, binds *litigants* rather than federal *district courts*. "The contrast between the text of [the AIA] and the unambiguous jurisdictional terms in [the TIA] shows that Congress would have spoken in clearer terms if it intended for [the AIA] 'to have similar jurisdictional force.'" *Santos-Zacaria*, 598 U.S. at 419 (quoting *Gonzalez*, 565 U.S. at 143).

## D. Consistent with a Non-Jurisdictional View of the AIA, the Supreme Court Has Long Permitted Equitable Exceptions and Waiver.

The Supreme Court's caselaw interpreting the AIA does not support a jurisdictional interpretation. The Court held as early as 1932 that in cases of an illegal tax presenting "special and extraordinary circumstances" that were "sufficient to bring the case within some acknowledge head of equity jurisprudence," a pre-enforcement challenge to the tax was cognizable notwithstanding the AIA. *Miller v. Standard Nut Margarine Co. of Fla.*, 284 U.S. 498, 509 (1932). Since courts may not craft equitable exceptions to jurisdictional statutes, *Nut Margarine* is irreconcilable with a jurisdictional AIA. That case was not a one-off.

Rather, two even earlier cases from the Supreme Court recognized equitable exceptions to the AIA. *Dodge v. Osborn*, 240 U.S. 118, 122 (1916) (AIA permits pre-enforcement challenge where "some extraordinary and entirely exceptional circumstance" is present); *see also Bailey v. George*, 259 U.S. 16, 20 (1922) (same).

Corroborating the point, a long litany of lower-court cases historically affirmed equitable exceptions to the AIA's bar on pre-enforcement tax challenges. *See, e.g.*, *Huston v. Iowa Soap Co.*, 85 F.2d 649, 652 (8th Cir. 1936) (AIA "not an absolute bar in every case to injunctive relief"); *Larabee Flour Mills Co. v. Nee*, 12 F.Supp. 395, 399 (W.D. Mo. 1935) (AIA "does not prohibit a suit in equity to restrain the collection of a tax where the tax is illegally exacted and where the taxpayer has no adequate remedy at law for its recovery if it is paid by him"); *John A. Gebelein, Inc. v. Milbourne*, 12 F.Supp. 105, 121 (D. Md. 1935) (AIA does not apply to novel cases resulting in "exceptional and unusual hardship" and "irreparable damage"); *Acklin v. People's Sav. Ass'n*, 293 F. 392, 394 (N.D. Ohio 1923) (the "existence of exceptional cases" will permit review notwithstanding the AIA). While the Supreme Court later adopted a more restrictive reading of the AIA, *Nut Margarine*

18

remains good law. *See Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962) (reframing prerequisite for pre-enforcement challenge, under *Nut Margarine*, as whether "under no circumstances could the Government ultimately prevail"). These long-standing equitable exceptions to the AIA foreclose a jurisdictional conclusion.

So too does the fact that the government has, more than once, affirmatively waived AIA defenses or arguments in order to allow an action to proceed. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940); *Pollock v. Farmers' Loan & Trust Co.,* 157 U.S. 429 (1895). The modern concept of jurisdiction does not work that way—further reinforcing that the AIA is not "jurisdictional" in the contemporary sense.

### E.    The AIA Is a Claims-Processing Rule.

If the AIA is not a jurisdictional statute, then what is it? Rightly understood, the Anti-Injunction Act is a mandatory claims processing rule. That means that, in *most* cases, a taxpayer must pay the tax owed before bringing suit.

This construal is consistent with the text of the statute, which—like other exhaustion requirements—binds the *parties* to a suit, not the court. It is consistent with the structure of the statute, which is situated in a

19

nonjurisdictional provision, contains numerous exceptions, and has historically been treated as waivable. And it is consistent with the context of the statute, which lacks a legislative record suggesting jurisdiction. No wonder the AIA historically has been construed by the Supreme Court as nonjurisdictional.

## III. The AIA, Properly Construed, Allows Plaintiffs' Suit to Proceed.

Like other non-jurisdictional claims-processing rules, the AIA is subject to equitable exceptions. As the Supreme Court itself has recognized: where "some extraordinary and entirely exceptional circumstance" is present, a pre-enforcement challenge to a tax may be entertained by a court. *Dodge*, 240 U.S. at 122; *see also Bailey*, 259 U.S. at 20 (1922) (same). Rightly understood, the AIA "does not prohibit a suit in equity to restrain the collection of a tax where the tax is illegally exacted and where the taxpayer has no adequate remedy at law for its recovery if it is paid by him." *Larabee Flour Mills*, 12 F.Supp. at 399; *John A. Gebelein, Inc.*, 12 F.Supp. at 121 (AIA does not apply to novel cases resulting in "exceptional and unusual hardship" and "irreparable

20

damage"); *Acklin*, 293 F. at 394 ("exceptional cases" reviewable notwithstanding AIA).

A party seeking to enjoin a tax prior to its collection must demonstrate some reason why the usual legal remedy—pay the tax and seek a refund—is inadequate. *See Bailey*, 259 U.S. at 20 (AIA applicable where "[n]o fact is alleged which would prevent [the parties] from availing themselves of" the remedy of paying the tax and *thereafter* bringing suit). And the invocation of a court's equitable powers to enjoin a tax prior to collection is only warranted where "the enforcement of the tax would . . . produce irreparable injury[.]" *Dows v. City of Chicago*, 78 U.S. 108, 110 (1870).

That bar is readily cleared here. In order to bring the sort of claim contemplated in this action, a church or religious leader must affirmatively violate the Johnson Amendment's restrictions by engaging in religious speech about politics, must *then* forfeit its tax exemption and incur potentially immense financial liabilities, and *only then* be permitted to bring suit to challenge the Amendment. Those financial penalties cannot "be lightly cast aside." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970). Numerous religious institutions—

21

many of which depend on tax exemptions to make ends meet—will simply not survive the up-front costs associated with such a litigation path. Beyond even "irreparable injury," they face potential annihilation.

The AIA cannot, and does not, compel this result. Historically and textually, the AIA is not a jurisdictional bar, but a claims-processing rule, and from early on, courts understood that it should be interpreted with certain equitable exceptions—such as the presence of extraordinary circumstances or risk of an irreparable injury—in view. Those circumstances are clearly present here. Religious institutions that challenge the unconstitutional Johnson Amendment face existential stakes in the absence of judicial recognition of an AIA exemption. Consistent with the Supreme Court's trend towards a narrower—and more historically sound—understanding of the circumstances in which a bar to suit is in fact actually "jurisdictional," this Court should take this opportunity to place AIA jurisprudence onto firmer legal footing.

### CONCLUSION

The Court should reverse the decision below.

22

Dated: July 14, 2026                     /s/ Anne Marie Mackin

ANNE MARIE MACKIN
JOHN EHRETT (admission pending)
LEX POLITICA PLLC
700 Pennsylvania Ave. SE, #440
Washington, DC 20003
Tel.: (512) 354-1783
amackin@lexpolitica.com
jehrett@lexpolitica.com

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,200 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font size 14.


Dated: July 14, 2026              __/s/ Anne Marie Mackin
                                  ANNE MARIE MACKIN

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 14, 2026          /s/ Anne Marie Mackin
                              ANNE MARIE MACKIN