**No. 26-40237**
———————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**
———————————

National Religious Broadcasters; Sand Springs Church; First Baptist Church Waskom; Intercessors for America,

*Plaintiffs-Appellants*,

v.

Scott Bessent, Acting Commissioner of the Internal Revenue Service; Internal Revenue Service,

*Defendants-Appellees*.
———————————

On Appeal from the United States District Court
for the Eastern District of Texas

———————————

**BRIEF *AMICUS CURIAE* OF
AMERICA'S FUTURE,
PUBLIC ADVOCATE OF THE UNITED STATES,
PUBLIC ADVOCATE FOUNDATION,
CITIZENS UNITED, CITIZENS UNITED FOUNDATION,
ORTHODOX CHURCH MISSION FUND OF TEXAS,
ORTHODOX CHURCH MISSION FUND OF HOUSTON, TEXAS, AND
CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND
IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

———————————

Michael Boos
Washington, DC  20003

J. Mark Brewer
Johnson City, TX  78636

Rick Boyer
Lynchburg, VA  24506

William J. Olson*
Jeremiah L. Morgan
WILLIAM J. OLSON, P.C.
370 Maple Ave. West, Ste. 4
Vienna, VA  22180-5615
(703) 356-5070
wjo@mindspring.com
*Counsel of Record
July 14, 2026

Case No. 26-40237

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

NATIONAL RELIGIOUS BROADCASTERS, et al.,

Plaintiffs-Appellants,

v.

SCOTT BESSENT, et al.,

Defendants-Appellees,

---

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

National Religious Broadcasters, et al., Plaintiffs-Appellants.

Scott Bessent, Acting Commissioner of the Internal Revenue Service, et al., Defendants-Appellees.

America's Future, Public Advocate of the United States, Public Advocate Foundation, Citizens United, Citizens United Foundation, Orthodox Church Mission Fund of Texas, Orthodox Church Mission Fund of Houston, Texas, and Conservative Legal Defense and Education Fund, *Amici Curiae*.

William J. Olson, Jeremiah L. Morgan, Michael Boos, J. Mark Brewer, and Rick Boyer are counsel for *Amici Curiae*.

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 5th Circuit Rule 28.2.1, it is hereby certified that *amici curiae* America's Future, Public Advocate of the United States, Public Advocate Foundation, Citizens United, Citizens United Foundation, Orthodox Church Mission Fund of Texas, Orthodox Church Mission Fund of Houston, Texas, and Conservative Legal Defense and Education Fund are non-stock, nonprofit entities, have no parent companies, and no person or entity owns them or any part of them.

*/s/ William J. Olson*
William J. Olson
Attorney of Record for *Amici Curiae*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTEREST OF THE *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.   THE DISTRICT COURT ERRED IN FINDING THAT IT HAD NO JURISDICTION TO DECIDE THE CONSTITUTIONAL CHALLENGE PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.   Appellants' Issues Presented . . . . . . . . . . . . . . . . 5

     B.   The District Court Misconstrued Applicable Precedents and Failed to Search out the Purpose for which the AIA Was Enacted . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          1. *Bob Jones University v. Simon* Has No Application Here. . . . 6

          2. The District Court Failed to Recognize the AIA's Purpose. . . 7

          3. The District Court's Rule Would Require Appellants to Violate the Statute to Challenge It . . . . . . . . . . . . . . . 8

          4. The Challenge Here Does Not Relate to Assessing or Collecting a Tax . . . . . . . . . . . . . . . . . . . . . . 10

     C.   An Examination of the Purpose or Effect of a Statute Is Important to Understand Its Scope . . . . . . . . . . . . . . . 11

     D.   Other Circuits Have Interpreted the AIA Differently . . . . . . . . 13

II.    THE JOHNSON AMENDMENT EMPOWERS THE GOVERNMENT TO INTRUDE INTO THE EXCLUSIVE JURISDICTION OF THE CHURCH TO PREVENT CRITICISM OF GOVERNMENT . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    The Johnson Amendment Was Designed to Prevent Criticism of Incumbent Politicians, an Illegitimate Governmental Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.    In Practice, the Johnson Amendment Favors Churches which Are Compliant toward Government. . . . . . . . . . . . . . . . . . . 17

    C.    The Johnson Amendment Empowers the Government to Intrude on the Matters Exclusively within the Jurisdiction of the Church . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    D.    The Supreme Court Has Recognized this Jurisdictional Separation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    E.    For Many Churchmen in American History, Speaking Out against Public Policies They View as Evil Is Integral to Their Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    F.    The Johnson Amendment Cannot Be Enforced without Destroying Government Neutrality and Establishing Religion . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

**HOLY BIBLE**
*Matthew* 22:21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19
*Romans* 13:1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**CONSTITUTION**
Amendment I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, *passim*

**STATUTES**
26 U.S.C. § 7421(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Declaratory Judgment Act. . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Religious Freedom Restoration Act . . . . . . . . . . . . . . . . . . . . . . 2
Tax Anti-Injunction Act . . . . . . . . . . . . . . . . . . . . . . . . 5, *passim*

**CASES**
*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) . . . . . . . 9
*Bob Jones Univ. v. Simon*, 416 U.S. 725 (1974) . . . . . . . . . . . . . . . 6, 7
*Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. Cir. 2000). . . . . . . . . . 3
*Brown v. Duchesne*, 60 U.S. 183 (1857) . . . . . . . . . . . . . . . . . . . 12
*Christian Echoes Nat'l Ministry v. United States*, 470 F.2d 849
    (10th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
*Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011). . . . . . . . . . . . . 14
*Cohens v. Virginia*, 19 U.S. 264 (1821) . . . . . . . . . . . . . . . . . . . . 11
*Crandon v. United States*, 494 U.S. 152 (1990) . . . . . . . . . . . . . . . . 13
*Employment Division v. Smith*, 494 U.S. 872 (1990) . . . . . . . . . . . . . . 23
*Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1 (1962). . . . . . . . . . . 7
*Epperson v. Arkansas*, 393 U.S. 97 (1968) . . . . . . . . . . . . . . . . . . 28
*Everson v. Bd. of Educ.*, 330 U.S. 1 (1947) . . . . . . . . . . . . . . . . . . 23
*Garrison v. Louisiana*, 379 U.S. 64 (1964). . . . . . . . . . . . . . . . . . . 17
*Harper v. Rettig*, 46 F.4th 1 (1st Cir. 2022) . . . . . . . . . . . . . . . . . . 14
*In re Westmoreland Coal Co.*, 968 F.3d 526 (5th Cir. 2020). . . . . . . . . . 7, 10
*Larson v. Valente*, 456 U.S. 228 (1982). . . . . . . . . . . . . . . . . . . . 18
*Lemon v. Kurtzman*, 403 U.S. 602 (1971) . . . . . . . . . . . . . . . 26, 28, 29
*New York Times v. Sullivan*, 376 U.S. 254 (1964) . . . . . . . . . . . . . . . 17
*Reynolds v. United States*, 98 U.S. 145 (1879) . . . . . . . . . . . . . . . . 19
*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) . . . . . . . . . . . . 9

*United States v. American Trucking Ass'ns*, 310 U.S. 534 (1940) . . . . . . 11, 12
*Walz v. Tax Com. of New York*, 397 U.S. 664 (1970) . . . . . . . . . . 23, 24, 29
*Webster v. Doe*, 486 U.S. 592 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 12
*Zorach v. Clauson*, 343 U.S. 306 (1952) . . . . . . . . . . . . . . . . . . . . . . 18

**MISCELLANEOUS**

Chuck Baldwin, "New Research: Pastors Deliberately Keeping Flock In
    The Dark," *ChuckBaldwinLive.com* (Aug. 7, 2014) . . . . . . . . . . . . . 27
William Blackstone, Commentaries on the Laws of England (1765) . . . . . . . 20
Constitution of Virginia, Section 16, reprinted in Richard Perry and John
    Cooper, eds., Sources of Our Liberties rev'd ed. (1978) . . . . . . . 19, 20
Michael Duduit, "Henry Ward Beecher: Preaching to change lives and
    society," *Preaching.com* (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Charles Finney, Lectures on Systematic Theology (1851) . . . . . . . . . . . 24, 25
Richard Hammar, Church and Clergy Tax Guide (2007) . . . . . . . . . . . 15, 16
Charles Haynes, "James Madison: Champion of the 'cause of conscience,'"
    *Washington Times* (Dec. 12, 2016) . . . . . . . . . . . . . . . . . . . . . . . . 20
IRS Publication 1828, Tax Guide for Churches & Religious Organizations
    (Rev. Aug. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4
Mark Lippelmann, "Over 70 Years Later, The Johnson Amendment Continues
    to Chill Speech," *Alliance Defending Freedom* (Sept. 9, 2025) . . . . . . 2
James Madison, "Memorial and Remonstrance" (1785) . . . . . . . . . . . . 19-21
Wyatt McDowell, "How Religious Organizations and Churches Can Be
    Politically Correct," 42 Brandeis L.J. 71 (2003) . . . . . . . . . . . . 25, 26
National Association of Evangelicals, "Pastors Shouldn't Endorse
    Politicians," *NAE.org* (Mar. 29, 2017) . . . . . . . . . . . . . . . . . . 26, 27
Papers of Martin Luther King, Jr. (2000) . . . . . . . . . . . . . . . . . . . . . . . 25
Steven Richards, "IRS weaponized Johnson Amendment to target
    conservative pastors while ignoring liberals, DOJ finds," *Just the*
    *News* (Apr. 30, 2026) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Antonin Scalia and Bryan Garner, Reading Law (2012) . . . . . . . . . . . . . . 13
Erik Stanley, "Politics, Churches, and Constitutional Protections,"
    *ChurchLawandTax.com* (Apr. 14, 2022) . . . . . . . . . . . . . . . . . . . . 28
"Understanding the History and Impact of the Johnson Amendment – and
    Why It Chills Speech," *Institute for Free Speech* (Dec. 2, 2017) . . . 4, 16

Daniel Vande Zande, "Coercive Power and the Demise of the Star
    Chamber," The American Journal of Legal History, Vol. 50, No. 3
    (July 2008-10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
The Writings of Thomas Jefferson (1893) . . . . . . . . . . . . . . . . . . . 21, 22

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici curiae* America's Future, Public Advocate of the United States, Public Advocate Foundation, Citizens United, Citizens United Foundation, Orthodox Church Mission Fund of Texas, Orthodox Church Mission Fund of Houston, Texas, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal income taxation under Section 501(c)(3) or (c)(4) of the Internal Revenue Code ("IRC").  Most of these *amici* filed an *amicus* brief in this case in the District Court.[2]

## STATEMENT OF THE CASE

Angered by having been criticized by nonprofit organizations in one of his campaigns for re-election, then-Senator Lyndon Baines Johnson (D-TX) pushed through the "Johnson Amendment" in 1954 without hearings or meaningful floor debate, to bar IRC section 501(c)(3) nonprofit organizations, including churches

---

[1] It is hereby certified that all parties consented to the filing of this brief *amicus curiae*; that no counsel for a party authored this brief in whole or in part; and that no person other than these *amici curiae*, their members, or their counsel made a monetary contribution to its preparation or submission.

[2] *See* Brief *Amicus Curiae* of America's Future, et al. (Aug. 11, 2025).

1

and other houses of worship, from supporting or opposing candidates or ballot issues, or making statements in support of or in opposition to either.[3]

In August 2024, during the Biden Administration, Plaintiffs challenged the Johnson Amendment, alleging numerous constitutional violations as well as claims under the Religious Freedom Restoration Act. On July 7, 2025, the parties jointly asked the district court to enter a permanent injunction based on a consent decree giving a narrowing construction to the amendment as applied to houses of worship, to prevent the government from censoring or punishing houses of worship for speaking "to its congregation, through its customary channels of communication on matters of faith in connection with religious services, concerning electoral politics viewed through the lens of religious faith." Joint Motion for Entry of Consent Judgment, Dkt. 35 at 1-2.

The district court declined to implement the agreement of the parties based on its determination that it had no jurisdiction, being "barred by the Tax Anti-Injunction Act (AIA) and the related tax-suit bar in the Declaratory Judgment Act (DJA)." *National Religious Broadcasters v. Scott Bessent*, 2026 U.S. Dist. LEXIS 70314, at *5 (E.D. Tex. 2026) (hereinafter "*NRB*"). The district court

---

[3] *See* Mark Lippelmann, "Over 70 Years Later, The Johnson Amendment Continues to Chill Speech," Alliance Defending Freedom (Sept. 9, 2025).

held that "[t]he AIA's and DJA's tax-suit provisions are jurisdictional, and a court's jurisdiction is determined from the operative complaint. It cannot be waived or created by litigation conduct." *Id*.

*Enforcement of Johnson Amendment*

The only instance known to these *amici* where the Internal Revenue Service ("IRS") successfully revoked the 501(c)(3) status of a church involved the Church at Pierce Creek in New York in 1992.[4] However, the IRS has investigated many churches for violations.[5] The number of enforcement cases is unknown, as most churches have self-censored. The IRS has taken the Johnson Amendment seriously, providing guidance to churches and religious organizations about what is prohibited:

> Under the Internal Revenue Code, all IRS Section 501(c)(3) organizations, including churches and religious organizations, are absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign … for elective public office…. [P]ublic statements of position (verbal or written) made by or on behalf of the organizations in favor of (or in opposition to) any candidate for public office clearly violate[s] the prohibition [which] may result in denial or revocation of tax-exempt status and the imposition of excise tax…. [V]oter education or registration activities with evidence of bias that: (a) would favor one candidate

---

[4] *See Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. Cir. 2000).

[5] *See* Steven Richards, "IRS weaponized Johnson Amendment to target conservative pastors while ignoring liberals, DOJ finds," *Just the News* (Apr. 30, 2026).

over another; (b) oppose a candidate in some manner; or (c) have the effect of favoring a candidate or group of candidates, will constitute prohibited participation or intervention. [IRS Publication 1828, Tax Guide for Churches & Religious Organizations (Rev. 8-2015) at 7.]

And, for 72 years, American churches have muzzled themselves to avoid incurring the cost of defending an enforcement action, and even more significantly, the loss of their tax-exempt status, providing a classic example of the chilling effect of a penalty being imposed on speech.[6]

In another well-known case not involving a church, *Christian Echoes Nat'l Ministry v. United States*, 470 F.2d 849 (10th Cir. 1972), a Christian ministry lost its tax exemption for a combination of lobbying and electoral activities where the court applied a highly discretionary test: "The political activities of an organization must be balanced in the context of the objectives and circumstances of the organization to determine whether a *substantial* part of its activities was to influence or attempt to influence legislation." *Id*. at 855. The organization's publication "did not formally endorse specific candidates for office" and "specific legislation was not mentioned." *Id*. at 855-56. However, the Tenth Circuit concluded the organization's "objective [was] to change the composition

---

[6] *See* "Understanding the History and Impact of the Johnson Amendment – and Why It Chills Speech," *Institute for Free Speech* (Dec. 2, 2017).

4

of the federal government."  If this is to be the standard, one can see why

churches are be chilled by the Johnson Amendment from taking a position on

legislation or elections.

## ARGUMENT

## I.    THE DISTRICT COURT ERRED IN FINDING THAT IT HAD NO JURISDICTION TO DECIDE THE CONSTITUTIONAL CHALLENGE PRESENTED.

### A.    Appellants' Issues Presented.

Appellants identify two issues they ask this Court to resolve.

1.  Is the AIA a jurisdictional bar, or a claim-processing rule the Government waived — clearing the way for the consent judgment the parties sought?

2.  Does the suit fall outside the AIA — and the DJA's coextensive exception — whatever their character?  (Appellants' Brief ("Aplt. Br.") at 2.)

These *amici* believe that Appellants have fully addressed the first issue,

and thus will focus on whether the AIA has any application to the claims brought

here.  On that issue, Appellants summarized their position as follows:

1. "The AIA reaches only a suit to restrain the assessment or collection of a tax;"

2. "This suit challenges a rule that silences speech; any tax sits several discretionary steps away, behind a violation Plaintiffs will never commit;" and

5

3. "Plaintiffs have no other way to sue; and a challenged action guards no revenue." (Aplt. Br. at 2.)

These *amici* present additional reasons and authorities in support of their points.

**B.     The District Court Misconstrued Applicable Precedents and Failed to Search out the Purpose for which the AIA Was Enacted.**

### 1. *Bob Jones University v. Simon* Has No Application Here.

Even before addressing Appellants' legal arguments, the district court simply asserted that the AIA "withhold[s] jurisdiction over plaintiffs' claims" based on what it believed to be the rule established by *Bob Jones Univ. v. Simon*, 416 U.S. 725, 738-39 (1974):  "a suit to prevent the loss of § 501(c)(3) status is a suit to enjoin taxation." *NRB* at *5.  The district court continued to rely on this case throughout its opinion, citing it 10 more times (*NRB* at *8, *9, *10, *13 (four times), *14 (two times), and *15).  However, injunctive relief by *Bob Jones University* was sought **after** the IRS notified the University that it intended to:  (i) revoke the University's existing ruling letter granting 501(c)(3) status; (ii) impose not only federal income taxes, but also Social Security taxes and federal unemployment taxes; and (iii) remove the University from the IRS Cumulative List of Organizations eligible to receive tax-deductible contributions.  *See Bob Jones* at 735.  Thus, the suit filed by Bob Jones University was a classic suit to

prevent the imposition of a tax — the very purpose for which the AIA was enacted. *Bob Jones* has no application here, for the reasons discussed *infra*.

## 2. The District Court Failed to Recognize the AIA's Purpose.

The district court dismissed the complaint below based on its view that "[t]he AIA's … tax-suit provisions are jurisdictional." *NRB* at *5. The district court relied on this Court's general statement contained in a 2020 case that "[w]hen the AIA applies, it divests courts of subject-matter jurisdiction." *Id.* at *6 (quoting *In re Westmoreland Coal Co.*, 968 F.3d 526, 533 (5th Cir. 2020)). The district court engaged in no meaningful examination of this Court's operative phrase: "when the AIA applies." Additionally, the district court's analysis ignored the congressional purpose in enacting the AIA. The language of AIA sets out its purpose in the clearest of terms:

> no suit **for the purpose of restraining the assessment or collection of any tax** shall be maintained in any court by any person.… [26 U.S.C. § 7421(a) (emphasis added).]

The Supreme Court has plainly explained:

> [t]he manifest purpose of [the AIA] is to permit the United States to **assess and collect taxes** alleged to be due **without judicial intervention**, and to require that the legal right to the disputed sums be determined in a **suit for refund**. [*Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962) (emphasis added).]

7

From both the text and this Supreme Court statement, it is clear that the purpose of the AIA is to ensure that courts do not prevent the United States from either "assess[ing]" or "collect[ing]" taxes.  Neither of those activities is being pursued here.  The purpose of the AIA is to ensure that the taxpayer must pay the tax assessed before he may avail himself of a judicial remedy — which would come via a suit for refund.  Here, the IRS has neither "assess[ed]" nor attempted to "collect" a tax from Appellants.  It is the threat of removal of tax-exempt status that is being challenged by Appellants, not an actual assessment.  As Appellants argue:  "[t]he AIA reaches only a suit to restrain the assessment or collection of a tax.  This suit restrains neither.  It challenges a speech restriction."  Aplt. Br. at 12.

### 3.  The District Court's Rule Would Require Appellants to Violate the Statute to Challenge It.

The district court fails to grapple with how, under its decision, a challenge to the Johnson Amendment could be brought, merely speculating:  "[o]ther fora, however, **may** be available."  *NRB* at *12 (emphasis added).  However, the two possible options then identified by the district court both require the church to violate the Johnson Amendment, after which the church could seek a refund or challenge a revocation of the church's tax determination.  *Id*.  This ruling

8

violates a well-established rule that a party can bring a pre-enforcement, facial challenge to a restriction on speech based on a representation that the party intends to engage in protected speech that would be sanctioned by the challenged restriction. Although this rule is often expressed in terms of standing and justiciability, it operates to prevent a court from imposing an insurmountable restriction on a challenge to a restriction without requiring it to be violated, as occurs here. In essence, the Supreme Court has stated that there may be pre-enforcement challenges to restrictions which have a "chilling effect" on speech to avoid the need for speakers to self-censor. Just as in *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), here: "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

In the absence of a violation of the Johnson Amendment, there could be no tax to be paid for which the Appellants could seek a refund, and no change in tax-exempt status to be challenged. Thus, the district court has developed a test to bring a constitutional challenge which cannot be met by Appellants or any

9

other plaintiff without putting them at risk — which certainly was never the purpose of the AIA.

The AIA was designed to protect the public fisc from an injunction which would allow a taxpayer to retain the tax assessed while challenging its legality. The district court here is misusing the AIA to prevent a taxpayer from obtaining judicial protection from government threats to withdraw an exemption to which the taxpayer is entitled.

### 4. The Challenge Here Does Not Relate to Assessing or Collecting a Tax.

As Appellants have explained, their litigation was not brought for the purpose of "restraining the assessment or collection of any tax." Not only has no tax been assessed, because Appellants have self-censored to avoid such a liability, and what they challenge is not a tax — but the punishment of their religious speech. "This suit challenges a rule that silences speech; any tax sits several discretionary steps away, behind a violation Plaintiffs will never commit." Aplt. Br. at 2. Thus, this manifestly is not a case "when the AIA applies." *Westmoreland* at 533.

There may be reasons that the district court would have preferred not to decide this case, but declining to do so based on the AIA is not an option.

Indeed, the district court, as all courts do, has a duty to decide a case which was properly brought.  As Chief Justice John Marshall explained more than two centuries ago:

> We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.  The one or the other would be treason to the constitution.  **Questions may occur which we would gladly avoid; but we cannot avoid them**.  All we can do is, to exercise our best judgment, and conscientiously to perform our duty.  In doing this, on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the constitution and laws of the United States.  We find no exception to this grant, and we cannot insert one.  [*Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (emphasis added).]

### C.   An Examination of the Purpose or Effect of a Statute Is Important to Understand Its Scope.

Although an analysis of a statute begins with its text, there are circumstances where its purpose must be examined.  Here, the district court applied the AIA in such a rigid fashion that it made it impossible for a party to challenge an important violation of the First Amendment.  The realization that it left the plaintiffs no path to a judicial remedy should have alerted the district court that it was misreading the purpose of the statute:

> There is, of course, no more persuasive evidence of the purpose of a statute than **the words** by which the legislature undertook to give expression to its wishes….  When that meaning has led to **absurd or futile results**, however, this Court has looked beyond the words to

the purpose of the act.  [*United States v. American Trucking Ass'ns*, 310 U.S. 534, 543 (1940) (emphasis added).]

Surely preventing a challenge to an unconstitutional law would have been an "absurd" result.  The text of a statute is not to be interpreted in such a fashion. "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear….  We require this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988).

Judicial consideration of the "purpose and object" of a statute is not a new concept.  The Supreme Court long ago explained that:

in interpreting a statute, the court will not look merely to a particular clause in which general **words** may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the **objects** and **policy** of the law, as indicated by its various provisions, and give to it such a construction as will **carry into execution the will of the Legislature**.  [*Brown v. Duchesne*, 60 U.S. 183, 194 (1857) (emphasis added).]

12

Courts do not seek out the objects and policy of the law to devise ways to justify imposing their personal preferences on the text, but rather to understand how their decisions are to be made consistent with the "will of the Legislature."[7]

This rule of interpretation has been repeated by the Supreme Court. "In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its **object** and **policy**." *Crandon v. United States*, 494 U.S. 152, 158 (1990) (emphasis added).

### D.    Other Circuits Have Interpreted the AIA Differently.

Other circuits have ruled that the AIA does not apply in circumstances such as those presented here — where the suit does not challenge the assessment and collection of taxes. These *amici* urge this Court to follow the approach taken by the First and D.C. Circuits, which properly understood that the AIA's text had to be understood in the context of the congressional purpose which only governs the actual assessment or collection of taxes.

When a challenge was brought to the IRS's authority to issue summonses, the First Circuit searched out the purpose of the AIA and correctly ruled that

---

[7] *See* Antonin Scalia and Bryan Garner, Reading Law: The Interpretation of Legal Texts, "Presumption Against Ineffectiveness" (2012).

13

"[b]ecause appellant's suit challenges the IRS's information-gathering authority and the Anti-Injunction Act limits our jurisdiction only in suits involving assessment and collection, the Act is not an applicable exception to the United States' waiver of sovereign immunity in 5 U.S.C. § 702." *Harper v. Rettig*, 46 F.4th 1, 8 (1st Cir. 2022).

The D.C. Circuit has also rejected the idea that all challenges to a system of taxation are necessarily so related to "assessment" and "collection" as to be jurisdictionally barred. The D.C. Circuit ruled that "'[a]ssessment' is not 'synonymous with the entire plan of taxation,' but rather with 'the trigger for levy and collection efforts'…. The assessment and collection in this case are long-since completed…." *Cohen v. United States,* 650 F.3d 717, 726 (D.C. Cir. 2011). Here, no assessment or collection will ever take place, as Appellants have self-censored to avoid violating the amendment. So AIA presents no jurisdictional bar.

## II.    THE JOHNSON AMENDMENT EMPOWERS THE GOVERNMENT TO INTRUDE INTO THE EXCLUSIVE JURISDICTION OF THE CHURCH TO PREVENT CRITICISM OF GOVERNMENT.

In Section I, *supra*, these *amici* explained why the district court erred in viewing the Anti-Injunction Act as a barrier to it entering "a consent judgment" which would have brought "a final resolution of plaintiffs' claims" against the

Johnson Amendment. *NRB* at *4. In violation of long-standing precedents, the district court interpreted the AIA to require churches to violate the Johnson Amendment to obtain its review, putting at risk their tax-exempt status and liability for taxes before challenging it. The practical effect of this flawed interpretation of AIA is to prevent any constitutional challenge to the Johnson Amendment, thereby allowing its chilling effect on the church to continue without remedy for a wrong.

Additionally, as discussed in this Section, the district court interpretation of the AIA enabled government to exercise a wholly illegitimate power through an intrusion into the exclusive jurisdiction of the church in order to punish criticism by churches of incumbent office holders.

### A. The Johnson Amendment Was Designed to Prevent Criticism of Incumbent Politicians, an Illegitimate Governmental Purpose.

A highly regarded treatise on church law tells the story of, and reveals the true purpose of, the Johnson Amendment.

> It was proposed in 1954 by then Senator Lyndon B. Johnson of Texas as a **floor amendment** to the tax code, and was **passed without explanation**. Apparently, Senator Johnson was attempting to **limit the political activities of a private foundation that had supported one of his opponents** in a Texas election. It is clear that **few, if any, Senators contemplated** in 1954 that the newly enacted limitation could be used to **threaten the tax-exempt status of**

15

**churches**.  [Richard Hammar, Church and Clergy Tax Guide at 591 (2007) (emphasis added).]

These *amici* believe that this treatise by attorney-CPA Richard R. Hammar provides the accurate story surrounding enactment of the Johnson Amendment. It is consistent with other accounts of the adoption of the Johnson Amendment,[8] and leads to these conclusions:

(a) the Amendment was rushed through the Senate as a floor amendment, indicating it did not go through the normal committee review process, as an exercise of the raw political power of Senator Lyndon Johnson;

(b) the fact that the Amendment was adopted without debate indicates that it was not given any thoughtful consideration;

(c) Johnson's purpose for the Amendment was political retaliation against an anti-Communist nonprofit organization, as well as an effort to silence any further criticism of him (and other political incumbents); and

(d) the Amendment was designed to prevent IRC § 501(c)(3) organizations generally from supporting or opposing candidates for office, with no apparent thought that it would or should apply to churches.

The use of federal law to punish harsh criticism of the actions of government, and those wielding government power, is not new.  Such laws in this country began with the Sedition Act of 1798, which although was never

---

[8] *See, e.g.*, "Understanding the History and Impact of the Johnson Amendment – and Why It Chills Speech," *Institute for Free Speech* (Dec. 2, 2017); *see also* 100 *Cong. Rec.* 9604 (July 2, 1954).

16

struck down, has been repeatedly rejected as an illegitimate use of government power. *See New York Times v. Sullivan*, 376 U.S. 254, 276 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history.") *See also Garrison v. Louisiana*, 379 U.S. 64, 83 (1964) (Douglas, J., concurring). Many politicians being criticized seem to believe that they embody the government, and holding them in disrepute is equivalent to committing seditious libel — the punishment of which was one of the functions of the Star Chamber.[9] For all these reasons, any law designed to protect government and its agents from criticism (even harsh criticism) by churches is illegitimate and inherently void.

 **B.**   **In Practice, the Johnson Amendment Favors Churches which Are Compliant toward Government.**

The Johnson Amendment discriminates between churches with different doctrines. One such doctrinal issue that divides churches is whether the church has a duty to speak out on matters of public interest, which can include a duty to criticize government officials when they violate Biblical principles. The Johnson Amendment threatens churches that believe they have a duty to speak out, while

---

[9] *See* Daniel Vande Zande, "Coercive Power and the Demise of the Star Chamber," The American Journal of Legal History, Vol. 50, No. 3 (July 2008-10) at 326 ("[T]he Court was used to coercively enforce laws against religious dissent and seditious libel").

presenting no threat to churches which are compliant with government and uncritical of government officials.

The Supreme Court has repeatedly declared the Establishment Clause's principle of neutrality between competing religious beliefs. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). "The government must be neutral when it comes to competition between sects." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). The Johnson Amendment violates this principle of neutrality.

Thus, the Johnson Amendment only serves the illegitimate government interest of favoring those religious faiths which do not "meddle" in "secular" matters of government, including such speech as criticizing and opposing incumbent elected officials to hold them to account for their policies — especially those which violate Biblical principles.

**C.    The Johnson Amendment Empowers the Government to Intrude on the Matters Exclusively within the Jurisdiction of the Church.**

Holy Scripture teaches that both the Church and the State are under the authority of God. "For there is no power but of God: the powers that be are ordained of God." *Romans* 13:1. Each operates in its own sphere: "Render

18

therefore unto Caesar the things which are Caesar's; and unto God the things that are God's." *Matthew* 22:21.  This jurisdictional principle was the basis for the First Amendment's religion clauses:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  Those words were not original to the Constitution.  As the Supreme Court has noted, they were enshrined first in Virginia, under the inspiration of Thomas Jefferson and James Madison.  Jefferson and Madison identified a clear jurisdictional line between the authority of civil government and the realm of "religion," which was defined as the duty of the individual to his or her Creator.

The First Amendment does not define the word "religion," but in 1879, the Supreme Court recognized and adopted James Madison's definition.  The Court noted that, in his famous "Memorial and Remonstrance Against Religious Assessments," James Madison "demonstrated 'that **religion, or the duty we owe the Creator**,' was not within the cognizance of civil government." *Reynolds v. United States*, 98 U.S. 145, 163 (1879) (emphasis added).

The view of Madison and Jefferson had already been enshrined in the 1776 Virginia Declaration of Rights before the First Amendment was drafted.  Section 16 of the Declaration (now Article I, Section 16 of the Virginia Constitution) read, "religion, or the duty which we owe to our Creator, and the manner of

19

discharging it, can be directed only by reason and conviction, not by force or violence; and therefore all men are equally entitled to the free exercise of religion, according to the dictates of conscience…."[10]

As the Declaration of Independence and later the Constitution were being drafted, Virginia had already undertaken the "world's boldest … experiment in religious freedom," grounded in Madison's determination to defend "**liberty of conscience**, for all."[11]  Madison's salient role in developing the Virginia Declaration of Rights is indispensable to understanding the religion clauses of the First Amendment, the Virginia Declaration's lineal descendant.[12]

Madison saw a clear jurisdictional line of demarcation between religion and government.  Nine years after the Virginia Declaration of Rights, in 1785, Madison wrote his "Memorial and Remonstrance":

> Because we hold it for a fundamental and undeniable truth, "that **Religion** or the duty which we owe to our Creator and the manner

---

[10] *See* Constitution of Virginia, Section 16, reprinted in Richard Perry and John Cooper, eds., Sources of Our Liberties rev'd ed. (1978) at 312.

[11] Charles Haynes, "James Madison: Champion of the 'cause of conscience,'" *Washington Times* (Dec. 12, 2016) (emphasis added).

[12] Although the Madisonian vision of limited government was radical, it was not without antecedent.  Sir William Blackstone explained that, at common law, the state properly had jurisdiction only to make the rules governing "civil conduct," not the rules governing "moral conduct," much less "the rule[s] of faith."  1 William Blackstone, Commentaries on the Laws of England at 45 (1765).

of discharging it, can be directed only by reason and conviction, not by force or violence."[…]  This right is in its nature an unalienable right….  It is unalienable also, because what is here a right towards men, is **a duty towards the Creator**….  This duty is precedent, both in order of time and in degree of obligation, to the claims of Civil Society.  Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governour of the Universe: […]  We maintain therefore that in matters of Religion, no mans right is abridged by the institution of Civil Society and that **Religion is wholly exempt from its cognizance**.[13]

Madison's Memorial and Remonstrance became the foundational language for the Virginia Statute for Religious Freedom, written largely by Thomas Jefferson, and passed shortly after the Virginia Declaration, in 1786.  Drawing from Madison's text, the Statute's language presents a clear jurisdictional divide.  The Statute provides:

Almighty God hath created the mind free….  [T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors, is sinful and tyrannical….  **[T]o suffer the civil magistrate to intrude his powers into the field of opinion and to restrain the profession or propagation of principles on supposition of their ill tendency is a dangerous falacy**, which at once destroys all religious liberty….[14]

The First Amendment embodies this same jurisdictional statement —

"Congress shall make no law" — the same revolutionary jurisdictional claims

---

[13]  J. Madison, "Memorial and Remonstrance" (1785) (emphasis added).

[14]  II The Writings of Thomas Jefferson at 237-39 (1893) (emphasis added).

21

that Madison and Jefferson stood for in Virginia.  Madison rejected the notion that government should only be tolerant of religion, because government had no authority whatsoever over religion.  Based on that principle, the government has no authority to monitor and muzzle churches under the Johnson Amendment.  Any law which purports to empower the federal government with the authority to monitor and penalize the doctrine and speech of the church breaches that jurisdictional line.  The Johnson Amendment is such a law.

Lastly, the Statute for Religious Freedom asserts another principle applicable here, that "no man shall be … restrained, molested, or burthened … or shall otherwise suffer, on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinions in matters of religion." *Id.* at 239.  The Statute concludes by decreeing that "**if any act shall be hereafter passed to repeal the present or to narrow its operation, such act will be an infringement of natural right**." *Id.* (emphasis added).  Such a law, which would include the Johnson Amendment, it should be treated as void *ab initio*.

22

**D.    The Supreme Court Has Recognized this Jurisdictional Separation.**

The Supreme Court has repeatedly "recognized that the provisions of the First Amendment, in the drafting and adoption of which Madison and Jefferson played such leading roles, had the same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute." *Everson v. Bd. of Educ.*, 330 U.S. 1, 13 (1947).  Even in the much-criticized *Employment Division v. Smith*, 494 U.S. 872 (1990), the High Court recognized that government may not "regulate religious beliefs [or] the communication of religious beliefs." *Smith* at 882.

In the context of tax law, the Supreme Court has declared that the purpose of the religion clauses is "to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Walz v. Tax Com. of New York*, 397 U.S. 664, 669 (1970).  The Court further declared that "[w]e must also be sure that the end result — the effect [of a law] — is not an excessive government entanglement with religion." *Id.* at 674.  To that end, the Court has made clear that "[s]tate power is no more to be used so as to handicap religions than it is to favor them," or the Establishment Clause is violated. *Everson* at 18.  The Johnson Amendment both "regulate[s] … the communication of religious beliefs"

23

(*Smith* at 882), and punishes only those churches whose doctrine requires them to speak on matters of public importance.

The Supreme Court has long been clear that the religion clauses permit Congress to grant tax exemptions to religious organizations.  "It is significant that Congress, from its earliest days, has viewed the Religion Clauses of the Constitution as authorizing statutory real estate tax exemption to religious bodies."  *Walz* at 677.  But once Congress has granted an exemption, it cannot grant it selectively only to those who agree not to speak about or criticize government.  *Id.* at 676-77.  Government cannot give favorable tax treatment to compliant churches while punishing those who believe their religion requires them to engage in the civic arena.

### E. For Many Churchmen in American History, Speaking Out against Public Policies They View as Evil Is Integral to Their Faith.

Throughout America's history, religious leaders have argued that their religious texts demand that adherents be involved in the process of selecting the leaders and the laws that are to govern us.  The famous nineteenth century revivalist Charles Finney said, "all men are under a perpetual and unalterable moral obligation to … exert their influence to secure a legislation that is in

24

accordance with the law of God."[15]  Dr. Martin Luther King argued, "every Christian is confronted with the basic responsibility of working courageously for a non-segregated society….  The churches are called upon to recognize the urgent necessity of taking a forthright stand on this crucial issue.  If we are to remain true to the Gospel of Jesus Christ, we cannot rest until segregation and discrimination are banished from every area of American life."[16]

The great abolitionist preacher Henry Ward Beecher "went beyond the traditional bounds of the preachers of his day to create a national pulpit from which he sought to apply the Christian message to a variety of issues in both the personal and the political/social arena."[17]  Beecher lived out his beliefs and "became actively involved in various reform movements, from anti-slavery to woman's suffrage.  He often used his pulpit to address such issues, as well as using his oratorical skills in purely political settings."  *Id*.

Most of America's great social reforms have been championed by religious movements, and most of those have been sparked from the pulpit.  Indeed, "[t]he

---

[15]  Charles Finney, Lectures on Systematic Theology at 354 (William Tegg & Co.: 1851).

[16]  IV Papers of Martin Luther King, Jr. at 187 (Univ. of California Press: 2000).

[17]  Michael Duduit, "Henry Ward Beecher: Preaching to change lives and society," *Preaching.com* (2023).

church's very capacity to be the church, to be faithful to its moral traditions and sense of mission requires an engagement with society that may be threatened by extreme or discriminatory application of Internal Revenue Service … lobbying or campaign regulations."[18]  The Supreme Court itself has recognized that, while the state must be neutral between religious beliefs, religion itself requires taking stands on issues of conscience:  "[d]octrines and faith are not inculcated or advanced by neutrals." *Lemon v. Kurtzman*, 403 U.S. 602, 618 (1971).  "'[A]dherents of particular faiths and individual churches frequently take strong positions on public issues.' *Walz* … at 670. We could not expect otherwise, for religious values pervade the fabric of our national life." *Lemon* at 623.

### F.    The Johnson Amendment Cannot Be Enforced without Destroying Government Neutrality and Establishing Religion.

Religious beliefs vary greatly, even within denominations.  In Christianity, some religious leaders believe that the pulpit is not the place for candidate endorsements.  A 2017 National Association of Evangelicals survey showed 89 percent of respondent "evangelical leaders" believing that pastors should not

---

[18]  Wyatt McDowell, "How Religious Organizations and Churches Can Be Politically Correct," 42 Brandeis L.J. 71 (2003).

endorse candidates from the pulpit.[19]  John Stumbo, president of the Christian and Missionary Alliance, stated, "[o]ur calling is higher — our message is greater and our audience must be broader — than using our brief time in the pulpit for political endorsements."  *Id.*

On the other hand, many Christians believe God commands them to speak out.  Pastor and former Constitution Party presidential candidate Chuck Baldwin, citing statistics from the Barna Group that "less than 10 percent of pastors … say they will speak to" cultural and political issues from the pulpit, has very different religious views.[20]  "Ninety-percent of America's pastors say they KNOW that the Bible speaks to all of these issues, but they are deliberately determined to NOT teach these Biblical principles," Baldwin argued.  "Please understand this: America's malaise is directly due to the deliberate disobedience of America's pastors — and the willingness of the Christians in the pews to tolerate the disobedience of their pastor."

Yet the Johnson Amendment would provide tax exemption to compliant churches while withholding it from critical churches.  This the government may

---

[19]  National Association of Evangelicals, "Pastors Shouldn't Endorse Politicians," *NAE.org* (Mar. 29, 2017).

[20]  Chuck Baldwin, "New Research: Pastors Deliberately Keeping Flock In The Dark," *ChuckBaldwinLive.com* (Aug. 7, 2014).

not do. Such a blatant violation of the principle of government neutrality between religious beliefs eviscerates the Establishment Clause. As the Supreme Court has made clear: "[t]he First Amendment **mandates governmental neutrality between religion and religion**, and between religion and nonreligion." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) (emphasis added).

No such neutrality is possible while the Johnson Amendment stands. Its enforcement requires a "comprehensive, discriminating, and continuing state surveillance … to ensure that these restrictions are obeyed." *Lemon* at 619. But this, the Supreme Court reminds us, is impermissible, as it inevitably "will involve excessive and enduring entanglement between state and church." *Id*. As professor Erik Stanley has written, "[t]he IRS cannot enforce the Johnson Amendment without an IRS agent parsing the speech of a church or a pastor's sermon or other speech to determine if it crossed the line into a Johnson Amendment violation…. Such enforcement of the Johnson Amendment would unconstitutionally entangle the government with religion."[21] As Justice Brennan put it years ago, "[t]he picture of state inspectors prowling the halls … and auditing … instruction surely raises more than an imagined specter of

---

[21] Erik Stanley, "Politics, Churches, and Constitutional Protections," *ChurchLawandTax.com* (Apr. 14, 2022).

governmental 'secularization of a creed.'" *Lemon* at 650 (Brennan, J., concurring).

By enabling the IRS to grant tax exemption to churches who choose to remain silent about political issues and candidates, while withholding equal treatment from others because they exercise their time-honored historical right to speak, the government has invaded the jurisdiction of the church and entangled itself with religion. The Johnson Amendment violates the Supreme Court's promise that "no religion [may] be sponsored or favored, none commanded, and none inhibited." *Walz* at 669.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of dismissal and remand with instructions for the district court to enter the parties' joint motion for a consent judgment.

Respectfully submitted,

Michael Boos
CITIZENS UNITED
1006 Pennsylvania Ave. SE
Washington, DC  20003

J. Mark Brewer
209 N. Nugent Ave.
Johnson City, TX  78636

William J. Olson*
Jeremiah L. Morgan
WILLIAM J. OLSON, P.C.
370 Maple Ave. West, Ste. 4
Vienna, VA  22180-5615
(703) 356-5070
wjo@mindspring.com
July 14, 2026
*Counsel of Record

Rick Boyer
INTEGRITY LAW FIRM
P.O. Box 10953
Lynchburg, VA  24506

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, et al. in Support of Plaintiffs-Appellants and Reversal, was made, this 14th day of July, 2026, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of America's Future, et al. in Support of Plaintiffs-Appellants and Reversal complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,302 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as Circuit Rule 32.1, because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

　　　　　　　　　　　 */s/ William J. Olson*
　　　　　　　　　　　 William J. Olson
　　　　　　　　　　　 Attorney for *Amici Curiae*
　　　　　　　　　　　 Dated: July 14, 2026